STATE OF VERMONT
SUPERIOR COURT — ENVIRONMENTAL DIVISION

| | | |
|---|---|---|
| In re Lathrop Limited Partnership I | } | Docket No. 122-7-04 Vtec |
| (f/k/a Appeal of Rueger, et al.) | } | (appeal from conditional use approval) |

*********************************************************************************************

| | | |
|---|---|---|
| In re Lathrop Limited Partnership II | } | Docket No. 210-9-08 Vtec |
| | } | (appeal from conditional use denial) |

*********************************************************************************************

| | | |
|---|---|---|
| In re Lathrop Limited Partnership | } | Docket No. 136-8-10 Vtec |
| Act 250 Permit Application | } | (appeal from District 9 Environmental |
| (Act 250 Application No. 9A0315-2) | } | Act 250 Commission determination) |

## Decision on the Merits

Lathrop Limited Partnership ("Lathrop") seeks municipal and state land use approval for a new sand and gravel extraction project it proposes on its property located just south of the downtown district for the Town of Bristol, Vermont ("Town" or "Bristol"). As suggested by the above-listed docket numbers, the project and concerns about it have a long history, both before this Court and before the applicable municipal and state land use review panels. To provide context for this Merits Decision, we first provide a procedural summary of the appeals addressed by this Court and the decisions issued prior to the consolidated merits hearing.

## Procedural History

### I. Municipal permit proceedings

#### a. Lathrop I, Docket No. 122-7-04 Vtec.

Lathrop first sought a municipal land use permit for its proposed project in 2003. The Town of Bristol Zoning Board of Adjustment ("ZBA") reviewed Lathrop's application and initially determined that under the Town of Bristol Zoning Bylaws and Regulations, as amended and effective Nov. 26, 2003 ("Bylaws"), the proposed project could only be permitted if it received conditional use approval. In re Lathrop Ltd. P'ship, LLP, Findings of Fact, Conditional Use Permit (Town of Bristol ZBA July 6, 2004). The ZBA then approved Lathrop's conditional use application, subject to 23 conditions; that ZBA approval became the subject of

1

an appeal filed by a group of concerned neighbors.[1] That appeal was assigned Docket No. 122-7-04 Vtec. Neighbors opposed to the project principally argued that the ZBA mistakenly allowed for conditional use review and that the project was prohibited under the Bylaws.

The parties filed cross motions for summary judgment, which the Court initially addressed in its May 5, 2005 decision. In re Appeal of Rueger, No. 122-7-04 Vtec, slip op. at 3-5 (Vt. Envtl. Ct. May 5, 2005)(Durkin, J.). The Court made two preliminary determinations: first, that Bylaws § 526 authorized "the removal of sand and gravel for sale . . . [in any Town zoning district, but] only after conditional use review and approval . . . ." Id. at 4. Second, the Court concluded that the project as proposed by Lathrop was not, as the appealing neighbors contended, an impermissible expansion of an un-permitted, pre-existing, and non-conforming sand and gravel extraction operation that existed on the property from 1971 to 1990. Id. at 5.

Neighbors sought permission to file an interlocutory appeal from this Court's determinations in the Rueger appeal, which this Court denied by Entry Order filed on July 8, 2005. Neighbors then appealed that decision to the Vermont Supreme Court, which denied Neighbors' interlocutory appeal request. See In re Rueger Appeal, No. 05-286, slip op. at 1 (Vt. Aug. 25, 2005)(unpub. mem.).

The parties thereafter attempted to complete pre-trial discovery. At the request of the parties, the Court placed the Rueger appeal on inactive status while Lathrop sought additional permit approvals for its project. At a later date and after additional appeals were filed, the Court changed the name of the Rueger appeal to Lathrop I.

b. **Lathrop II, Docket No. 210-9-08 Vtec.**

In response, at least in part, to some of the concerns and criticisms expressed about the first design of the proposed project, Lathrop revised its plans and submitted a new municipal permit application in 2007. Lathrop proposed more specific and distinct phasing of its

---

[1] Russell and Mary Ann Rueger, Jill Mackler, John Pandiani, Naoimi Swier, Randall Freeman, and John Moyers all appear as appellants in the Lathrop I appeal and are represented by James Allan Dumont, Esq.

Andrew Jackson, Esq. also appears as an appellant in Lathrop I and appears as attorney of record for his fellow appellants: Carolyn Dundon, David Durgin, Rhineholdt Lange, Kendra & Tim Gratton, Kevin Harper, Peter Myer, Katie Raycroft, Eric Neal, Slim C. Pickins, and Paul Ralston.

David & Susan Folino also appear as appellants in Lathrop I as self-represented litigants.

extraction operations and proposed landscaping, plantings, and earthen mounds to aid in the screening of the project.[2]

The ZBA denied Lathrop's second conditional use application in its decision dated September 18, 2008. The ZBA based its denial principally upon its determination that Lathrop's sand and gravel extraction operation would not comply with Bylaws § 526(2), which directs that:

> The removal of [sand and gravel] material shall be conducted so as to result in the improvement of the land, having due regard to the contours in the vicinity such as leveling slopes and removing hills. The digging or creating of pits or steep slopes shall not be permitted, unless provision is made to refill such pit.

Id.; see also In re Lathrop Ltd. P'ship Conditional Use Permit, Decision Regarding Permit Application, No. 07-77, at 8–10 (Town of Bristol ZBA Sept. 18, 2008). The ZBA concluded that Lathrop's revised plan would result in a "pit" being left at the conclusion of Lathrop's planned extraction activities. Since Lathrop did not propose to "refill" this alleged pit as part of its reclamation plan, the ZBA concluded that Lathrop's revised plan violated Bylaws § 526(2). Id. at 10.

Lathrop filed a timely appeal of that denial. We refer to this appeal as Lathrop II. Some of the concerned neighbors from the Lathrop I appeal appeared as interested persons in the Lathrop II appeal, joined by several other concerned neighbors.[3]

Some of the Neighbors[4] filed a motion to dismiss Lathrop's appeal, asserting several grounds for dismissal including that the second municipal application was not ripe for review or that it asked for an advisory opinion. Mr. and Mrs. Morris filed their own motion to dismiss, on similar grounds. By Entry Order dated November 18, 2008, this Court denied those

---

[2] The ZBA provided a summary of the distinction between the first and second municipal permit applications in its decision on Lathrop's 2007 application. See In re Lathrop Ltd. P'ship Conditional Use Permit, Decision Regarding Permit Application, No. 07-77, at 3 (Town of Bristol ZBA Sept. 18, 2008).

[3] Russell and Mary Ann Rueger, Naomi Drummond, Randall Freeman, John Moyers, Kelly Laliberte, Kevin Harper, John C. Pickens, Maria Peabody, and John Pandiani appear as Interested Persons in the Lathrop II appeal and are represented by James Allan Dumont, Esq. Donald and Mary Morris also appear as Interested Persons and are represented by James W. Runcie, Esq. David & Susan Folino, Bruz Brown, Sally L. & Charles H. Mammen, and Sandra Murphy also appear as Interested Persons in Lathrop II as self-represented litigants.

[4] All of the concerned neighbors in all the pending appeals are hereinafter collectively referred to as "Neighbors" in this Merits Decision. Some of the Neighbors will be referred to by their individual names in this Decision, where appropriate.

3

Neighbors' dismissal motions, concluding that Lathrop's revised application in Lathrop II presented the Court with a valid case or controversy and did not constitute an impermissible successive application. See In re Lathrop Ltd. P'ship II, No. 210-9-08 Vtec, slip op. at 1 (Vt. Envtl. Ct. Nov. 18, 2008)(Durkin, J.). Lathrop chose not to go forward with the approval received of their first municipal application and to instead make revisions to their proposal and submit a revised application. Those revisions included many changes meant to mitigate the impacts on the Neighbors and the surrounding neighborhood. We found then and restate now that we are aware of no state law or caselaw precedent prohibiting a land owner from voluntarily submitting an alternate proposal to a development application that has previously been approved.

Neighbors then moved for summary judgment, asserting that Bylaws § 526(2) prohibited Lathrop's revised plan as a matter of law, since Lathrop does not propose to "refill" its project site, which the Neighbors contended would constitute a "pit." The Town filed a legal memorandum in support of the Neighbors' summary judgment motion, but also offered a different rationale for summary judgment against Lathrop and its project: the Town asserted that Lathrop's presentation before the ZBA in regards to its reclamation plan was so minimal that the Court should conclude that Lathrop failed to make any presentation to the ZBA on its reclamation plans and should therefore be barred from making any presentation on reclamation to this Court on appeal.

The Court denied the Town's and Neighbors' requests for summary judgment. First, the Court concluded that the determination of whether Lathrop's site would constitute a "pit" after all extraction and reclamation was completed was a highly fact-dependent legal determination that must await the evidentiary presentations at trial. In re Lathrop Ltd. P'ship II, No. 210-9-08 Vtec, slip op. at 3 (Vt. Envtl. Ct. Aug. 14, 2009)(Durkin, J.). Second, the Court concluded that, during its *de novo* review, Lathrop may not be barred from presenting more compelling evidence of how its project may conform to the Bylaws, including revisions to their project and reclamation plans, so long as the revisions do not revise the project so significantly as to require a new application. Id. at 4 (citing In re Sisters & Brothers Inv. Group, LLP, 2009 VT 58, ¶ 21, 186 Vt. 103).

The parties then requested that the Court stay both municipal appeals until Lathrop's Act 250 permit application proceedings were completed and it was determined whether an

4

appeal would be filed from the Act 250 determination. The Court granted this stay request by Entry Order dated September 15, 2009.

## II. State land use permit proceedings

### a. Lathrop Ltd. P'ship, No. 64-3-06 Vtec (Act 250 Application #9A0315).

Lathrop filed its first Act 250 permit application (#9A0315) in 2006, while this Court was addressing the appeal of its first municipal permit application referenced above in the discussion of Lathrop I. In Lathrop's first Act 250 application, Lathrop requested that the District #9 Environmental Commission ("District Commission") only consider whether its proposed project conformed to the Town of Bristol Town Plan ("Town Plan").[5] Once these proceedings came before the Court, Lathrop's reasoning for only requesting partial findings from the District Commission under Act 250 Criterion 10 became apparent: there was a concern on the part of Lathrop officials, and a conviction on the part of the concerned Neighbors, that the Town Plan prohibited quarrying and sand and gravel extraction operations in the zoning districts where the Lathrop project site was located. When the District Commission concluded that Lathrop's proposed project did not conform to the Town Plan, Lathrop filed a timely appeal to this Court. That appeal was assigned Docket No. 64-3-06 Vtec.

Neighbor John Moyers filed a cross-appeal from the District Commission's other determination;[6] Neighbors Kevin Harper, John C. Pickens, Russell and Mary Ann Rueger, Kelly Laliberte, and Carl and Caroline Engvall appeared as Interested Persons in this Act 250 appeal; all Neighbors who appeared in this appeal were represented by James A. Dumont, Esq.

Lathrop and Mr. Moyers filed cross-motions for summary judgment, arguing for or against the ability of Lathrop's proposed project to conform to the Town Plan. The Court partially granted Lathrop's summary judgment motion and denied Mr. Moyers's corresponding motion by concluding that the Town Plan does not specifically prohibit quarries and sand and gravel extraction operations within the applicable zoning district. In re Lathrop Ltd. P'ship, No.

---

[5] 10 V.S.A. § 6086(a)(10) requires factual findings and legal conclusions that a proposed project "conform[s] with any duly adopted local or regional plan . . . ."

[6] The District Commission concluded that Lathrop's sand and gravel extraction would result in a "pit" and that a post-extraction pit was prohibited under the Town Plan. It also concluded, however, that Lathrop's planned access road off of South Street was permitted under the Town Plan. See Re: Lathrop Ltd. P'ship, LLC Application, No. 9A0315, Mem. of Decision (Dist. #9 Envtl. Comm. Mar. 16, 2006). Mr. Moyers's cross-appeal concerned the Commission's determination that Lathrop's South Street access road conformed to the Town Plan.

5

64-3-06 Vtec, slip op. at 4–10 (Vt. Envtl. Ct. Nov. 29, 2006)(Durkin, J.). The Court declined, however, to fully grant Lathrop's summary judgment request, concluding that the legal question of whether Lathrop's specific project conformed to the Town Plan (and was therefore in conformance with Act 250 Criterion 10), must await the presentation of specific details of Lathrop's proposed project, which could only be ascertained at trial. Id. Lastly, the Court denied Mr. Morris's request that the Court conclude that the Town Plan prohibited the construction and use of Lathrop's access road, which would be located in a different zoning district than the extraction site.

In response to the Court's decision on the parties' cross-motions for summary judgment, the Neighbors requested that the Court reconsider its determinations. Lathrop filed its own motion requesting that its pending Act 250 application be remanded to the District Commission for consideration under all relevant Act 250 criteria. The Court consolidated these two pending motions and set them for an in-person hearing on March 7, 2007 to receive the parties' oral arguments. At the conclusion of the parties' presentations, the Court issued its rulings from the bench, denying Neighbors' motion for reconsideration and granting Lathrop's request that its Act 250 application be remanded to the District Commission. As a consequence of the remand, the Court closed the appeal in Docket No. 64-3-06 Vtec; that Act 250 appeal was not the subject of the consolidated trial that is the subject of this Merits Decision.

b. **Lathrop Ltd. P'ship, No. 136-8-10 Vtec (Act 250 Application #9A0315-2).**

On remand, the District Commission considered Lathrop's revised project plans, which by that time included some further revisions to what Lathrop submitted to the ZBA in support of its request for conditional use approval.[7] The District Commission noted that:

> [A]ll parties agreed that the applicant through submission of the application material has met the burden of proof with respect to the following [Act 250] Criteria or [that] such Criteria are not applicable:

| | | | |
|---|---|---|---|
| 1 – | Water Quality | 1(A) – | Headwaters |
| 1(C) – | Water Conservation | 1(D) – | Floodways |
| 1(E) – | Streams | 1(F) – | Shorelines |

---

[7] The details of Lathrop's project plans, as presented to the Court at trial, are reviewed in the Findings of Fact, below.

The District Commission decision notes that Lathrop's remanded application was actually withdrawn, that "modifications were made to that application, and the current version of the application was presented again to the District #9 Commission on February 26, 2010." Re: Lathrop Gravel, No. 9A0315-2, Mem. of Decision, at 1 (Dist. #9 Envtl. Comm. July 27, 2010).

6

| 4 – | Soil Erosion | 6 – | Educational Services |
|---|---|---|---|
| 7 – | Municipal Services | 9(D) | Earth Resources |
| 9(F) – | Energy Conservation | 9(G) – | Private Utilities |
| 9(H) – | Costs of Scattered Development | 9(J) – | Public Utilities. |

Re: Lathrop Gravel, No. 9A0315-2, Mem. of Decision, at 3–4 (Dist. #9 Envtl. Comm. July 27, 2010).

The District Commission reviewed all remaining Act 250 criteria that it deemed applicable to the Lathrop project. In particular, the Commission concluded that Lathrop had failed to present sufficient evidence to support a determination of conformance with Act 250 Criteria 8 (impacts upon the scenic or natural beauty of the area, aesthetics, or rare and irreplaceable natural areas), 9(E) (impacts from extraction of earth resources), and 9(K) (impacts upon public investments, which the Commission identified as the public roads over which the Lathrop trucks will travel).[8] Id. at 4–13. The Commission deferred its determination on Act 250 Criterion 10, specifically concerning the project's conformance with the Town Plan, since it anticipated that Lathrop would submit further evidence in support of its project's conformance with Criteria 5, 8, 9(E), and 9(K), and that a review of conformance with Criterion 10 should await that additional evidence. Id. at 1–2, 14.

Lathrop filed a timely appeal from the District Commission's July 27, 2010 Memorandum of Decision. All of the individuals who appeared in the prior appeals as Neighbors appeared as Interested Persons in this appeal by Lathrop; Sue Small and George Landis also appeared as Interested Persons, also represented by James A. Dumont, Esq., and joined the ranks of the concerned Neighbors in this last appeal.

In an Entry Order issued on December 8, 2010, the Court granted Lathrop's motion to coordinate the three pending appeals (Docket Nos. 122-7-04 Vtec, 210-9-08 Vtec, and 136-8-10 Vtec). Pursuant to the Court's Scheduling Order of October 11, 2010, the two municipal appeals (Docket Nos. 122-7-04 Vtec and 210-9-08 Vtec) were returned to active status and the parties were instructed to complete all needed pre-trial discovery.

---

[8] No appellant in the pending appeals challenged the District Commission's determination that the only resources of public investment that the project may impact are these town highways over which the Lathrop trucks would travel. We therefore regard that determination as final, pursuant to V.R.E.C.P. 5(f), and limit our analysis to potential impacts to the public investments in those portions of South Street and Hewitt Road that Lathrop now proposes its trucks will use.

Neighbors filed several additional motions in these consolidated appeals. The Court responded to each of Neighbors' motions in its Decision on Supplemental Pre-Trial Motions on April 12, 2011. Lathrop Ltd. P'ship, Nos. 122-7-04 Vtec, 210-9-08 Vtec, 136-8-10 Vtec, slip op. at 4-12 (Vt. Super. Ct. Envtl. Div. Apr. 12, 2011)(Durkin, J.). Specifically, the Court denied Neighbors' request to limit the evidence Lathrop was allowed to present at trial to evidence Lathrop already presented below to either the ZBA or the District Commission. Id. at 4-6.

One issue the parties continued to hotly contest, even through trial, was whether Lathrop's extraction plan would result in a "pit" being formed on the Lathrop site. Lathrop denied this claim and asserted that its completed project site would more likely resemble a "shallow saucer" type of land formation. Nonetheless, Lathrop asserted that it proposed during its presentation to the District Commission that after extraction was complete, it could remove a portion of the earthen mound that would otherwise be left between the extraction site and South Street. Thus, following extraction, the reclaimed site would be left at the same elevation as the area where the project's access road meets South Street.

Neighbors asserted that Lathrop never presented such an alternative plan to the District Commission, or to the ZBA for that matter, and as a consequence, the Court should prohibit Lathrop from presenting such new evidence to this Court at trial.

The Court rejected Neighbor's argument, and in doing so made reference to the Supreme Court precedent in In re Sisters and Brothers Inv. Group, LLP, 2009 VT 58, 186 Vt. 103. We noted that:

> The precedent applicable to the pending appeals holds that a court can hear evidence involving changes from an applicant's original proposal so long as the changes do not materially alter the application. Without such authority, we would stifle the ability of applicants to respond to the concerns expressed by interested persons, since any change would trigger remand, creating a "procedural ping-pong match" rather than final resolution. Sisters and Brothers Inv. Group, 2009 VT 58, ¶ 21. The Supreme Court rejected this rigid interpretation of when a change in a plan necessitates a new application by characterizing the project opponents' assertion as a "heads-I-win-tails-you-lose approach" to land use review. Id. For those same reasons, we decline to adopt such a rigid standard for reviewing the state land use permit application at issue in these consolidated appeals.

In re Lathrop Ltd. P'ship, Nos. 122-7-04 Vtec, 210-9-08 Vtec, and 136-8-10 Vtec, slip op. at 4–5 (Vt. Super. Ct., Envtl. Div. Apr. 12, 2011)(Durkin, J.).

The Court concluded this analysis by noting Lathrop's proposal to remove a portion of the remaining northern berm after all extraction was complete was not so material a change in

8

the overall project as to require a new application and new proceedings before the state and municipal panels. Rather, the Court concluded that Lathrop could present such a change to its proposed reclamation plan, whether or not it had specified it before the ZBA or District Commission. Id. at 5–6.

Neighbors also filed a motion for summary judgment, asserting that the differing applications in each appeal docket should be prohibited, are unconstitutional, and seek an impermissible advisory opinion from the Court. The Court rejected these arguments and denied Neighbors' summary judgment request. Id. at 6–10. The Court in this portion of its ruling concluded that Lathrop would be permitted to present evidence at trial concerning the details of its remediation plan, including the option of removing a portion of the earthen berm on the northerly face of the project site, near South Street. Id. at 10.

Lastly, the Court addressed Neighbors' request that the Court reconsider and change its determinations on Neighbors' summary judgment request in the Lathrop II appeal.[9] The Court had concluded that it needed to receive trial testimony and other evidence to resolve the legal issue of whether the Lathrop site, following excavation, would constitute a "pit" that would then require refilling in order to conform to Bylaws § 526(2). In its April 12, 2011 Decision, the Court repeated its prior conclusions that this legal issue was so fact-dependent and that the material facts were so disputed, that "summary judgment was inappropriate." Id. at 10. The Court also denied Neighbors' request that the legal issue concerning conformance with Bylaws § 526(2) be the subject of a "bifurcated" hearing, separate from the merits hearing. Id. at 11. The Court then directed the parties to complete the discovery process and advise the Court of when they were prepared to have the trial scheduled.

The Court ultimately began the trial on May 8, 2012. Based upon the parties' estimates of the needed trial time, the Court scheduled that trial to continue for nine days, through May 21, 2012. However, once the trial began, it became clear to the Court and the parties that more trial time would be needed. The Court thereafter scheduled three more days of trial on July 10 through 12, 2012, for a total of twelve days of trial. The Court then granted the parties' request to make post-trial filings, including proposed Findings of Fact and Conclusions of Law. In the course of preparing those filings, the parties requested a continuance of their filing deadlines, so

_____

[9] See In re Lathrop Ltd. P'ship II, No. 210-9-08 Vtec, slip op. at 2-4 (Vt. Envtl. Ct. Aug. 14, 2009) (Durkin, J.).

9

that they could order transcripts of the trial record from each day of trial, review those transcripts, and incorporate references to those transcripts in their post-trial filings. The Court granted the parties' extension request. The final filings were received by the Court such that the Merits Decision for these consolidated appeals came under advisement and ripe for the Court's review on March 15, 2013.

The Court has reviewed all of the parties' post-trial filings and reviewed passages of the trial transcript when referenced by the parties.

Lathrop has been represented throughout all these appeals by Mark G. Hall, Esq. The Town has been represented by Joseph S. McLean, Esq. and Amanda S.E. Lafferty, Esq. Melanie McNeill Kehne, Esq. entered her appearance on behalf of the Vermont Natural Resources Board – Land Use Panel in Docket No. 64-3-06 Vtec, but was directed by the Panel to not actively participate in the consolidated trial. The Court also provided courtesy copies of Court filings in Docket No. 136-8-10 Vtec to Attorney Kehne and the Vermont Agency of Natural Resources, at their requests.

The Court conducted a nearly day-long site visit with the parties on May 7, 2012. The Court explained at the site visit, and on the record of the first day of trial, that while the site visit was very helpful, particularly by putting into context the evidence received at trial, the site visit itself was not evidence and any observations or statements made during the site visit would not be relied upon by the Court, unless repeated by a testifying trial witness to allow any observations or statements to be received as evidence. The parties abided by this request, and the Court only used the site visit to provide context for the actual evidence received at trial.

During the trial, the parties urged the Court to revisit many of the legal issues addressed by the Court in its pre-trial decisions in the various appeals referenced above. The Court allowed the parties to present their evidence and additional legal arguments in support of their assertions. While the Court did reconsider the legal conclusions reached in each of its prior pre-trial decisions, the Court concluded that the trial evidence and legal arguments did not justify reversing any of those determinations, other than where we have specifically done so in the Conclusions of Law section, below.

### III. Other Procedural Matters

#### a. Outstanding Motions.

We need to address several other procedural matters before presenting the Court's Findings and Conclusions.

First, just prior to trial, Neighbors filed a motion in limine, requesting that the Court "rule as inadmissible Mr. Ken Kaliski's [Lathrop's expert witness regarding noise impacts] testimony that is based on computer modeling." Neighbors' Motion in Limine at 1 (filed April 26, 2012). The Court provided Lathrop and the other parties with ten business days in which to respond to this motion, which meant that the trial began with Neighbors' motion outstanding.

Lathrop also filed a motion in limine just prior to trial, requesting that the Court direct that all project opponents consolidate their presentation of objections and provide cross-examination of Lathrop's witnesses through just one attorney, even though three other attorneys were appearing for various parties and some other parties were appearing as self-represented litigants. Lathrop's Motion in Limine at 1 (filed April 30, 2012). This motion was also outstanding when the Court began the trial six business days later. The Court allowed all pro se litigants and each attorney appearing for one or more parties to both cross-examine Lathrop's witnesses and to present their own evidence at trial. While the Court did not specifically rule on Lathrop's limine motion before the end of trial, the practice followed during the trial constituted a de facto denial of Lathrop's limine motion. We have therefore this day directed the Court Clerk to enter on each Docket that Lathrop's limine motion has been **DENIED**.

As to the Neighbors' motion concerning Mr. Kaliski's computer modeling testimony, the Court decided at trial to allow that testimony and to make a determination after trial of whether Mr. Kaliski's testimony should remain as part of the record. Neighbors assert that the computer modeling software employed by Mr. Kaliski fails the Daubert minimum standards test for admissibility of scientific evidence employed by the Vermont Supreme Court. See State v. Streich, 163 Vt. 331, 342–43 (1995)(citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)). Neighbors also assert that Mr. Kaliski does not have sufficient knowledge or expertise concerning the modeling software to warrant the allowance of his trial testimony. We reject both of Neighbors' assertions.

Mr. Kaliski provided testimony that convinced us that the modeling software he employed, known as the Computer Aided Noise Abatement ("CADNA A") modeling software,

is accepted throughout his field as a reliable means for calculating, assessing, and predicting the noise impacts of a proposed project. CADNA A is used by experts in that field to predict future noise levels at specific receptor sites that the expert selects. The program takes into account the noise generating sources of a proposed project, topography, and other acoustical mitigating factors such as plants, trees, foliage, buildings, earthen berms (pre-existing or proposed), and the capacity of certain ground types to absorb sounds. Mr. Kaliski also showed a strong working knowledge of the CADNA A software, how it operates, and how the data demonstrated by the program may be reliably analyzed and interpreted.

Mr. Kaliski relied upon the CADNA A program to present demonstrative testimony and exhibits that the Court found helpful. Demonstrative exhibits and testimony have proved helpful in many courtroom settings and are admissible at trial, within the discretion of the trial court. See State v. Brown, 147 Vt. 324, 328 (1986)(noting that "admission of demonstrative evidence is within the discretion of the trial court and, in the absence of abuse," the trial court's determination will be upheld). We find the scientific evidence presented by Mr. Kaliski to be reliable and relevant to the issues on appeal.

In allowing Mr. Kaliski's testimony and demonstrative exhibits to remain in the record, we also note that this Court has discretion when considering the admission of evidence that, while "not admissible under the Rules of Evidence may be admitted in the discretion of the court if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs." V.R.E.C.P. 2(e)(1). We have, on many instances, received testimony and demonstrative exhibits concerning the expected noise impacts from future development projects. In many of those instances the expert witness has used the CADNA A software as the principal foundation for much of the testimony and demonstrative exhibits offered. We have found the evidence offered in those prior trials helpful, whether it has been offered in support of or in opposition to the proposed project. Since the undersigned began service at this Court, no party has presented an argument that the noise impact projections created with the CADNA A software have proved inaccurate. It is for all these reasons that we find Mr. Kaliski's testimony and his exhibits helpful, allow them to remain as part of our record here, and **DENY** Neighbor's limine motion.

Our docket entries note two other motions as outstanding, both filed by Neighbors prior to the tenth day of trial: first, a request that the Court restrict the witnesses that Lathrop would

be allowed to call in rebuttal, and second, a motion for judgment on partial findings, made when Lathrop had completed the presentation of some, but not all of its case in chief. Both motions are denied, for the reasons stated on the record of the July 10, 2012 trial day. The Court accommodated witnesses' time constraints and schedules, such that we took the testimony of several witnesses out of order, including witnesses offered by the Neighbors and Lathrop. Lathrop's attorney expressed concern about Lathrop's opportunity to be "both the first and last to speak" as the party bearing most all of the burdens of production and persuasion. The Court concludes that the schedule followed at trial afforded a full and fair hearing to all parties on the legal issues that the Court was charged with addressing.

In considering the motion for judgment on partial findings the Court must weigh the evidence then before it and determine whether Lathrop was not entitled to relief on certain issues. See V.R.C.P. 52(c); Gladstone v. Stuart Cinemas, Inc., 178 Vt. 104, 109 (2005)(noting that in considering a motion for judgment on partial findings the trial "judge does not have to consider the evidence in the light most favorable to the nonmoving party" but instead "[weighs] the evidence and [determines] whether the nonmovant is entitled to relief"). We could not say at that time that as a matter of law Lathrop was not entitled to relief on the issues raised in Neighbor's motion. In fact, at the time the motion was filed, Lathrop had not even completed offering all evidence in support of its case in chief. As such, we did not grant Neighbors' motion when it was presented and specifically **DENY** both remaining motions now.

**b. Legal Issues to be Addressed in this Merits Decision.**

In all de novo appeals, including those now before us, we are charged with addressing all legal issues preserved for our review by the appellants' respective statements of questions. Lathrop's appeal of the adverse determinations by the District Commission on Lathrop's Act 250 application presents a fairly straight-forward itinerary:

1. Does Lathrop's project conform to Act 250 Criterion 5, concerning traffic impacts?
2. Does the project conform to Criterion 8, concerning aesthetic impacts?
3. Does the project conform to Criterion 9(E), concerning impacts caused by Lathrop's planned earth extraction operations?
4. Does the project conform to Criterion 9(K), concerning impacts on public investments (specifically Hewitt Road and South Street)?

13

5. Does the project conform to Criterion 10, concerning conformance with a Town or Regional Plan?[10]

In regards to Neighbor's appeal of the ZBA conditional approval of Lathrop's first municipal permit application (Lathrop I), the following legal issues have been preserved for our review in these consolidated appeals:

1. Do the Bylaws permit the ZBA to grant a permit for a sand and gravel extraction operation, including its accessory uses, in either the Rural Agricultural ("RA-2") or Mixed Use ("MIX") Districts?

2. Do the Bylaws permit the ZBA to grant a permit for a gravel extraction operation where the project will create pits or steep slopes and the applicant did not commit to refill pits or steep slopes?

3. Does Lathrop's application adequately address all concerns for the health and safety of the residents of the Town of Bristol, including:

   a) the impacts of noise from gravel extraction and transportation?

   b) the dust, truck-exhaust, and other air pollution impacts from gravel extraction and transportation?

   c) the impacts of the proposed project upon water quality and floodplain/floodwater impacts?

4. Does the permit granted by the ZBA constitute an illegal extension of a prior nonconforming use?[11]

In regards to Lathrop's appeal of the ZBA conditional use denial of Lathrop's second municipal permit application (Lathrop II), the following legal issues have been preserved for our review in these consolidated appeals:

---

[10] 10 V.S.A. § 6086(a)(10) directs that for a project to receive Act 250 approval it must be shown to be in conformance with "any duly adopted local or regional plan or capital program . . . ." While there was some discussion at trial of the applicable regional plan, we understand that the only legal issue presented by this Question of Lathrop's in their August 30, 2010 Statement of Questions was whether its proposed project conforms with the Town Plan, since that was the specific basis for the District Commission's determination that the Lathrop project failed to conform to 10 V.S.A. § 6086(a)(10).

[11] Neighbors' December 13, 2005 Amended Statement of Questions (entitled "Amended List of Issues on Appeal") contained two additional Questions (numbered Questions 5 and 6) that alleged improper actions by ZBA members. However, Neighbors confirmed after trial that they had chosen not to pursue those questions at trial and had "abandoned" those Questions. See Neighbors' *Corrected* Proposed Findings of fact and Conclusions of Law, filed March 11, 2013.

In their March 11, 2013 Proposed Findings and Conclusions, Neighbors offer the following summary of the four legal issues raised in their appeal in Lathrop I: "[1] whether gravel extraction is permitted in these two [zoning] districts, [2] whether this project should be rejected because it calls for creation of a pit that will not be refilled, [3] whether the application submitted by [Lathrop] had adequately addressed all health, safety, noise, air and water pollution concerns and [4] whether the project would be an extension of a nonconforming use." Id. at 12.

1. Does the proposed project comply with § 526 of the Bylaws, which regulates extraction of soil, sand, or gravel?

2. Does the proposed project comply with § 341 of the Bylaws, which regulates conditional uses and sets out specific standards of review for conditional use approval?

3. Does the proposed project comply with § 810 of the Bylaws, which prohibits projects that will cause undue noise impacts on the surrounding area?[12]

4. Does the proposed project result in a "pit" or "steep slopes" as provided in § 526(2)?

5. Did the Bristol Zoning Board of Adjustment err by not finding that the applicant could comply with § 526(2) through a permit condition?

6. Do Bylaws provisions §§ 341, 526, and 810 provide the necessary specificity and guidance to the applicant and those charged with their enforcement?

7. Are Ordinance provisions §§ 341, 526, and 810 enforceable?

8. Does the proposed project meet all applicable Bylaws provisions?

There is some overlap in the Questions posed by Neighbors and Lathrop in the two separate municipal appeals. We have endeavored to address each issue raised in our Conclusions of Law section, below.

### c. Limitation on Issues That May Be Raised.

In their post-trial filings, Neighbors correctly note that Lathrop chose not to appeal from the ZBA's conditional approval of its municipal permit application (Lathrop I). As a consequence, Neighbors assert that Lathrop is precluded from now challenging the twenty-three conditions the ZBA imposed when it granted Lathrop's conditional use approval request, under the well-established precedents of In re Poole, 136 Vt. 242 (1978), In re Torres, 154 Vt. 233 (1990), and Village of Woodstock v. Bahramian, 160 Vt. 417 (1993). This line of cases stands, in part, for the proposition that on appeal this Court has the same authority to issue conditions as the body below, but that authority is limited to those issues for which appeal has been perfected. Bahramian, 160 Vt. at 424.

Were the Poole, Torres, and Bahramian decisions applicable to the appealed cases here, we would agree with Neighbors that the conditions imposed on Lathrop's project must remain undisturbed. But Neighbors' recitation of the procedural history here is incomplete; when all of

---

[12] Ordinance § 810 prohibits a proposed project that will cause "excessive [noise] at the property line and represents a significant increase in noise levels in the vicinity of the development so as to be incompatible with the reasonable use of the surrounding area . . . ." Id.

the procedural history is taken into account, we must reject Neighbors' assertion that a broad restriction applies to Lathrop's presentation of a changed project. As noted above, Lathrop chose not to pursue the project that the ZBA approved and chose instead to revise its project to address the negative impacts on the Neighbors. In response to Lathrop's revised application, the ZBA denied approval and Lathrop filed a timely appeal (Lathrop II).

In its December 9, 2008 Statement of Questions, Lathrop raises the legal issues of compliance with the Bylaws §§ 341, 526, and 810. In its revised application, Lathrop incorporated some of the project conditions imposed by the ZBA, which relate specifically to §§ 341, 526, and 810. Lathrop made further project modifications when they made their presentation at trial to this Court. As noted above, the Court previously ruled these project modifications are permissible under the Supreme Court precedent of Sisters & Brothers Inv. Group, LLP, 2009 VT 58, ¶ 21. Thus, the questions raised by Lathrop on appeal encompass the issue of whether the original conditions imposed by the ZBA are appropriate.

In light of this, we conclude that Lathrop has properly preserved its ability to assert that its revised project conforms to the Bylaws without condition. Thus, this Court may grant municipal and state land use approval for its revised project with certain conditions, which may or may not coincide with the twenty-three conditions the ZBA imposed in its approval of Lathrop's original proposal.

**Findings of Fact**

Based upon the evidence received at trial that the Court found to be credible, including that evidence put into context by the site visit, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision:

## I. History and Background

1. The Town of Bristol is located at the western foothills of the Green Mountain range in Addison County, approximately 25 miles from the eastern shores of Lake Champlain. The Town Village is located at the approximate geographic center of the Town; the Town Village serves as a vibrant business and community center.

2. The Town is located to the west of Vermont Route 7, the major north/south highway located along the western side of our State. Two highways that serve considerable traffic— Vermont Routes 17 and 116—travel through the Town in a general east/west direction and connect directly or indirectly to Route 7.

3.      The Town and surrounding areas are known for having significant, high-quality sand and gravel deposits.  Lathrop's expert, specializing in geology and hydrology (Mr. Stephen Revell), provided credible explanations for this: the pre-historic glacial formations that once occupied the area now known as Addison County are estimated to have been as much as one mile thick.  As those glacial formations moved and began to melt, the flow of water had a "scrubbing effect" on the underlying soils, sands, rock, and gravel.

4.      The melting glacier continued this flow of water, such that the level of what we now know as Lake Champlain began to rise.  Mr. Revell credibly estimated that the shores of what we now know as Lake Champlain reached what we now know as the Town of Bristol, causing this area to serve as a delta for the flow of glacial waters from the Green Mountain range into the Bristol-based shores of the Lake.  With this flow of water came sand, gravel, and rock.

5.      The sand and gravel that was transported by the melting glacial waters was deposited in the Bristol delta area and was continuously cleaned of clay and silt that flowed further to the west, as the waters of the Lake began to recede.  Thus, the Town of Bristol is known for its especially high-quality, clean, and significant deposits of sand and gravel.  Mr. Revell credibly testified that the sand and gravel deposits in the Town are regarded as being of the highest quality available in Addison County.

6.      Mr. Revell credibly testified that his examination of the Lathrop site (including soil borings) evidenced sand and gravel deposits that are very clean, deep, and consistent.  On a scale of 1–10, the sand and gravel deposits on the Lathrop site rank in the 8–10 range for quality, consistency, and depth of deposits.  Mr. Revell credibly estimated that because of the high quality and quantity of sand and gravel on and near the Lathrop site, customers would be willing to truck the sand and gravel from the Lathrop site for "up to 100 miles."

7.      The high quality of sand and gravel "delta deposits" in the Bristol area have likely contributed to the large number of sand and gravel extraction operations in and around Bristol.  In fact, there are ten current or former extraction operations within close proximity to the downtown Village area of Bristol.  Including current and former operations, sand and gravel have been or are currently being extracted at eighteen separate locations within a several mile radius of the Village area.  See Exhibit 7 (Map of "Existing and Former Bristol Area Sand & Gravel Extraction and Processing Operations (Revised Aug. 8, 2011)").

8. One Bristol-area sand and gravel extraction operation is adjacent to the Mount Abraham Union High School, which is located just northwest of Bristol Village, on Airport Road and just off of Route 116.

9. The multiple sand and gravel extraction operations in and around Town contribute to the working landscape of this vibrant community.

10. Lathrop owns an approximately 65-acre tract of land[13] that abuts South Street and Rounds Road. The Lathrop parcel is near the New Haven River (a portion of which is located just north of South Street) and is within sight of some portions of Bristol Village. See Exhibit 5, at EC1 (depicting existing conditions on the project site, the Claire Lathrop Band Mill Corp. property, South Street, and the New Haven River).

11. To the north of the Lathrop site, across South Street, is a commercial wood processing and chipping operation now known as Lathrop Forest Products, which is owned and operated by members of the Lathrop family. The predecessor to Lathrop Forest Products was the Claire Lathrop Band Mill, a lumber processing and sales operation operated by Claire Lathrop, father to Jim Lathrop, the principal of Lathrop Forest Products and Lathrop Limited Partnership. An aerial photo of the Claire Lathrop Band Mill and Lathrop Forest Products facilities, circa 2005, was admitted as Exhibit 37. Exhibit 37 depicts twelve kiln-drying buildings, various sorting and storage sheds, an equipment repair garage, wood pallet production facilities, and open-air log storage areas.

12. The New Haven River nearly encircles the Lathrop Forest Products parcel, serving as its boundary to the west, north, and east. The New Haven River generally flows from east to west, to the Otter Creek, which then flows in to Lake Champlain.

13. Across the New Haven River from the Lathrop Forest Products parcel are the remnants of a commercial business once known as the Bristol Manufacturing Company, which during the height of operation was the largest coffin manufacturing company in all of northern New England. The site of the current Lathrop Forest Products operation was once owned and operated as a saw mill and lumber yard by the owners of the Bristol Manufacturing Company and was used to supply lumber products for the coffin manufacturing operations. Photo

---

[13] The Lathrop property is held in five parcels by either Lathrop or by individual members of the Lathrop family. The individual parcels are depicted on a boundary map, a copy of which was admitted as Exhibit 5, at 1. The catch-all phrase "Lathrop parcel" is hereinafter used in this Decision when making reference to these five parcels.

postcards of the coffin manufacturing facilities were admitted into evidence as Exhibits 35 and 36.

14. When the coffin manufacturing business ceased operation, its buildings were allowed to deteriorate, such that only portions of the coffin factory building foundations now exist.

15. Clarence Lathrop, Claire Lathrop (Jim Lathrop's father), and their successors continued the operation of the saw mill until a fire in 2006 destroyed several of the saw mill buildings and other structures on the property.

16. Around 1994, Jim Lathrop, then the principal officer of the Lathrop family commercial operations, began producing wood chips from hard wood logs at the Claire Lathrop Band Mill facilities. The saw mill and lumber yard ceased operation after a decline in the domestic lumber market. After the 2006 fire, Mr. Lathrop invested in specialized "clean" wood chip production machines and converted most of the former Lathrop Band Mill structures and facilities to the production of clean hardwood chips. Lathrop Forest Products also continues to process timber logs into lumber, but the hardwood chip production represents the majority of its business operations.

17. Lathrop Forest Products processes hardwood timber logs into wood chips that are used in wood-fired boilers to heat and provide energy to a number of private, public, and educational facilities throughout the State of Vermont. Lathrop Forest Products is currently the largest supplier of wood chips to chip-burning facilities throughout our State.

18. Beginning around 1970 and continuing until about 1990, some member of the Lathrop family or business entities operated a sand and gravel extraction operation in the area where Lathrop now proposes the access road for its proposed project. This operation had no state or municipal permits. Extraction was from the north-facing wall of the hillside outside the area at which the proposed sand and gravel operation will operate. This un-permitted operation left an open area of sand and gravel exposed that was not reclaimed with topsoil. Therefore, the sand and gravel deposits remain exposed and natural ground cover has not regrown. See Exhibit 37.

19. The lumber yard operators also used the area of the un-permitted extraction operation for the storage of logs, lumber, and other materials.

20. When the coffin manufacturing business, lumber yard, and wood chip processing businesses were in operation, large trucks, including log trucks with large trailers, medium and

large dump trucks, and large tractor-trailer trucks, used the neighborhood roads to deliver supplies and products to and from these operations.

21.     The operation of various sand and gravel extraction operations has generated consistent medium and heavy truck traffic through the Bristol Village area, as explained in more detail in the section below on Operational Truck Traffic and Its Impacts. The historic commercial operations at the Bristol Manufacturing Co., Claire Lathrop Band Mill saw mill and lumber yard, and the Lathrop Forest Products wood chip operations also brought consistent medium and heavy truck traffic to the areas of South Street and Hewitt Road, as detailed below.

## II.  The Proposed Project (as revised and presented at trial)

### a.  General Overview

#### i.  Existing Conditions

22.     The project site is located on a 65-acre parcel of land owned by Lathrop or immediate family members and bordered by the following town highways: South Street (f/k/a River Road), Rounds Road, and Lower Notch Road. Where the Lathrop parcel is bordered by portions of South Street and Lower Notch Roads, the New Haven River runs along those town highways opposite the Lathrop parcel. Exhibit 5, at EC1.

23.     The Lathrop parcel is also bordered to the south and southeast by lands owned by Mr. and Mrs. Lathrop (son and daughter-in-law of Jim Lathrop, the principal of Lathrop Limited Partnership), the A. Johnson Co., a Mr. or Ms. Moye, and Donald and May Morris. Id.

24.     Access to the project site will be by way of a to-be-constructed access road that enters the site from South Street, approximately across from the entrance to the Lathrop Forest Products facilities. Delivery trucks to and from both the proposed project and Lathrop Forest Products will travel onto South Street, to Hewitt Road, and to Route 116, allowing deliveries of their various products to regions to the north, south, east and west. See Id. at SP4A–SP4C (depicting Access Road Erosion Prevention & Sediment Control Plans).

25.     The Lathrop parcel principally lies in two zoning districts: the Rural Agricultural Zoning District ("RA-2 District") and the Mixed Use Zoning District ("MIX District").[14] See Exhibit 5, at EC1.

_____

[14] Small portions along the edges of the Lathrop parcel encompass two other zoning districts: the High Density Residential Zoning District ("HDR District") and the Conservation Zoning District ("CON-25 District"). No project development or extraction will occur within these two other zoning districts.

26. All extraction activities will occur in the RA-2 District; there will not be extraction of sand and gravel within the MIX District or any other zoning district. Only the planned access road from South Street and the remediation of the now-closed and un-permitted extraction area on the northerly slopes of the Lathrop parcel will occur on lands in the MIX District. See Exhibit 5, pages SP4A–SP4C.

27. The Lathrop parcel encompasses a plateau, located generally to the south of the downtown Village area. The land slopes downward from the Village area, towards the New Haven River, and levels out in the area of the Lathrop Forest Products facilities and the nearby residences along Cold Springs Road, which runs along the westerly banks of the New Haven River. The land remains generally level, sometimes slightly sloping, as one crosses South Street, Rounds Road, and Lower Notch Road and onto the Lathrop parcel. After one enters onto the Lathrop parcel from South Street and the adjoining town highways, the land rises approximately 120 feet to a generally level area. Lathrop proposes to conduct its sand and gravel extraction activities within this plateau area.

28. This existing lay of the land is such that the Village area and the plateau on the Lathrop parcel form two opposite plateaus of land that are of approximately equal height, ranging in elevation from 575± feet to 590± feet above sea level. At the base of the planned access road, at its intersection with South Street, the Lathrop parcel is at an estimated elevation of 420± feet above sea level.

29. The Lathrop parcel includes a large open meadow and large wooded areas, all within the plateau area. The wooded areas encompass about half of the Lathrop project site and are located mostly in the southern portions of the parcel; the meadows section is located in the northern portion. See Exhibit 5, at EC1. The slopes on and adjacent to the Lathrop parcel, travelling in all directions downward from the plateau area, are generally wooded, except the area where the access road is now planned. Id.

ii. View Shed

30. Lathrop proposes to allow the embankments around the plateau on its parcel to remain wooded, thereby providing nearly complete screening of the proposed project for adjacent neighbors. A few residents living in the Village area, particularly Mr. Moyers, who lives in a beautifully-restored tower structure behind Main Street, currently have a direct view of the

21

meadows on the Lathrop parcel and will likely be able to view some portion of Lathrop's planned extraction project, particularly in its later phases. See Exhibit 5, at SP6–SP9.

31.     Above and to the east of the Village area, the landscape rises up a hillside, such that one can enjoy an expansive view of the Village area and lands beyond it, including the Lathrop parcel. An unspecified number of Town residents regularly visit this viewing area, known as "the Ledges." See Exhibit 6 (three dimensional context maps of the area). There will be a clear view of the Lathrop project, particularly as it enters its later phases (estimated to occur in operational years 16 to 30, and beyond), but the view is softened by the distance between the Ledges and the project site.

32.     The Lathrop Forest Products facilities and a portion of the proposed project site may also be viewed from an area along Route 116 to the west of the Village area, at an ice cream stand owned and operated by Neighbor Kelly Laliberte, although that view is obscured. See Exhibit 21, at 14–20, which consists of photos taken from the ice cream stand site. It is difficult for a motorist passing this ice cream stand to see the Lathrop project site.

iii.     Construction Phase; Access Road

33.     Lathrop proposes first to construct the access road from South Street into its project site. The road will travel over a northern portion of the Lathrop site, adjacent to South Street, and across the area where the un-permitted sand and gravel extraction operation once operated. A photo of the area where Lathrop will construct the new access road, taken from across South Street and on the Lathrop Forest Products' property, was admitted at trial. See Exhibit 9, at 1.

34.     The access road layout and construction are depicted on Lathrop's site plans, specifically detailed on Exhibit 5, at SP3, SP4-A, SP4-B, and SP4-C.

35.     The access road construction will begin with clearing and slope stabilization work along South Street, to either side of the proposed access road intersection. See Exhibit 5, at SP3. This work will begin the rehabilitation of the area where the un-permitted operations once operated and will also improve the site distances in either direction of South Street for vehicles entering and exiting the access road. Id.

36.     A simulated depiction of the completed access road area was admitted at trial. Exhibit 9, at 2. This simulation was prepared by Lathrop's landscape architect, Jeremy R. Owens, who used the existing conditions photograph of the area (Exhibit 9, at 1) and incorporated Lathrop's

plans for access road construction and area rehabilitation. Exhibit 9 provided a credible presentation of the area improvements Lathrop proposes.

37. The construction work on the access road will likely be completed in several months. Any remaining work on the access road, the surrounding area, and the improvements to South Street that Lathrop has agreed to complete will take about twelve months to complete. Once this work is completed, all excavation activities will occur within the project site and the earthen walls that will surround it.

38. Lathrop and its experts have presented credible erosion prevention and sedimentation control plans for the following three phases of the access road construction: the pre-construction phase (Exhibit 5, at SP4A); during the road construction (Exhibit 5, at SP4B), and once the access road construction is completed and that portion of the site stabilized (Exhibit 5, at SP4C).

39. The area of the former un-permitted extraction operation will be graded and sculpted so as to accommodate a level area for vehicles entering and exiting the proposed site that will allow clear views of in-coming and out-going traffic. Exhibit 5, at P1.

40. All sand and gravel for the construction of the access road, reclamation of the surrounding area, and other roadway site work will be taken from on-site stock. No off-site sand or gravel is required for this construction, reclamation, and other site work.

41. Lathrop and its experts have provided further details of their planned erosion prevention and sedimentation control plans in the vicinity of the former un-permitted extraction operation. See Exhibit 5, at D2–D4. Upon completion of the work on and near the access road, the site will be improved from its existing condition. The exposed sand and gravel areas will be covered with top soil, seeded, and mulched, and natural ground cover will be re-established.

42. The access road will rise gradually along the northern bank to the plateau area, with the road and its shoulders constructed just below the existing height of the plateau, so as to provide partial screening for some view sheds.

43. The access road will be paved for the portion running from the intersection with South Street to an area just past the highest point on the access road, where it enters the plateau area. This paving plan will help reduce dust and erosion along the access road. See Exhibit 5, at SP4A–SP4C.

44.     This planned access road construction, site remediation, and paving will improve the site and limit the dust arising as trucks and other vehicles travel over the access road and on to the public highways.  Lathrop has also agreed to require that all loaded trucks leaving its site shall have covered beds, so as to reduce the level of dust and other material being deposited on to the public roads and adjoining properties.  See Exhibit 34, at 2 (Air Quality Assessment).

45.     The access road construction will continue along the internal edge of the northwestern portion of the plateau area.  This will partially shield the access road and vehicles that travel along it from off-site views.

46.     Once this initial construction of the access road is completed, vehicles will be able to travel from South Street to the project site and the area of the initial excavation phase.  It will be difficult for most, if not all, off-site parties to see the vehicles travelling along the access road, particularly after a vehicle travels past the crest of the plateau and into the wooded areas of the project site, where the first excavation phases will be conducted.

47.     As excavation and extraction progress through the phases into the open meadows area of the project site, the access road will be realigned to accommodate the particular excavation area.  During the later phases of excavation, particularly in the current meadows and open fields, some of the access road may be visible.  Any visibility will most likely be from points above the project, especially the Ledges area, the ice cream stand, and the upper floors of Mr. Moyers's residence.  Each of these locations is a considerable distance from the project site.  That distance and the limited area of excavation, including along the access road, will minimize the visual impacts of the on-going project.

48.     The view from the Ledges of the project site as it currently exists is accurately depicted in Exhibit 8, at 1.  Lathrop's landscape architect, Mr. Owens, used this photo of the existing conditions to prepare simulations of how the project site is likely to appear from the Ledges vantage point during various stages of the excavation and extraction operations.  Exhibit 8, at 2–5.  Mr. Owens created these simulations by incorporating Lathrop's site plans onto the original photo of the site.  Mr. Owens's simulations provide an accurate depiction of how Lathrop intends to execute its project plans.  We find particularly compelling his depiction of the screening of excavated areas for the project's first fifteen years.  Id. at 2.  The fifty-foot buffer of woods between the woods and meadows sections will likely screen most views of the excavated areas during the first three phases of the project.

49.     The two earthen berms to be constructed along the northern area of the project site, with a wide row of trees planted on top, will provide additional screening for the subsequent phases of excavation, located in the meadows section.  These trees will be planted during the initial construction phase of the project; the trees will have nearly fifteen years to grow and mature before work in the meadows section begins.  Id. at 3.

50.     Once Lathrop completes its extraction operations and final restoration work, the site will return to a natural state.  The ground cover will appear very similar to its pre-construction condition, especially from an off-site vantage point, such as the Ledges.  Compare Exhibit 8, at 1 and 5.

        iv.  Improvements to South Street

51.     South Street was once used as a traffic bypass around Village area traffic and congestion.  At its eastern-most point, South Street commences at an intersection with Routes 116 and 17, which travel along Main Street through Bristol Village.  South Street then travels south from the Village.  The Street once travelled along a bridge over the New Haven River, but that bridge has been closed for several years; details of its repair were not provided at trial.  South Street then begins to border the Lathrop parcel on a portion of the parcel's eastern edge, then travels around the northern nob area of the Lathrop parcel, in the vicinity of the Lathrop Forest Products facilities.  South Street then continues along the Lathrop property until it intersects with Hewitt Road.  Travelling past this intersection, South Street becomes Lower Notch Road.

52.     Vehicles leaving the proposed Lathrop project site will travel along South Street and then onto Hewitt Road, which provides access to Route 116 just south of Bristol Village, and eventually onto Routes 7 to the south and 17 to the north.  Vehicles travelling from South Street to Hewitt Road could immediately access Bristol Village just after the two roads intersect by turning northerly onto Lovers Lane, a narrow residential street off of which several of the Neighbors' homes are located.  Lathrop has agreed to prohibit its trucks from using Lovers Lane.

53.     Just westerly of the South Street/Hewitt Road intersection, there is a concrete bridge that allows the traffic on Hewitt Road to travel over the New Haven River.

54.     The portion of South Street between the proposed access road and the junction with Hewitt Road is narrow at points and in need of repair.  Lathrop has agreed as a condition of final permit approval that prior to the extraction or sale of any excavated sand or gravel it will

25

make improvements to this portion of South Street to widen and improve its travel lanes and shoulders. See Exhibit 5, at SP3.

**b. Proposed Sand and Gravel Extraction.**

    i. General Operational Parameters

55. Lathrop proposes to extract sand and gravel from a 26±-acre portion of its 65±-acre parcel. The tree and topsoil removal, excavation, extraction of sand and gravel, material screening, crushing of larger stones, and remediation will occur in sequential phases, as detailed below and in the project plans. See Exhibit 5.

56. Lathrop proposes to extract an estimated 2.67 million cubic yards ("cy") of sand and gravel over the lifetime of the project. Lathrop estimates that the project may last thirty years, but specifically asks that it not be limited to a thirty-year time span. Rather, Lathrop proposes that its project be allowed to operate until demand for its sand and gravel exhausts the supply on its property.

57. Lathrop proposes that during the first fifteen years of excavation and extraction, Lathrop will extract, sell, and have trucked off-site a total of 60,000 cy of sand and gravel each operational season. Lathrop also proposes that it be authorized to extract up to 100,000 cy per operational season in years sixteen to thirty, and perhaps beyond.

58. Excavation and extraction will first occur in the southern portion of the Lathrop project site, in an area that is presently wooded. The excavation is planned to occur in a total of eight phases, with the first three phases of excavation and extraction occurring in the currently wooded section on the southern portion of the Lathrop project site, and the next five phases occurring in the meadows section of the Lathrop site.

59. All extraction will occur in an approximately 26± acre portion of the plateau area of the Lathrop parcel. Lathrop will excavate downward into the plateau area in order to maintain the existing hillsides along the exterior of the plateau and allow the wooded hillsides to screen the excavation and extraction work areas from most views, especially from adjacent and neighborhood properties.

60. The hillsides along the exterior of the plateau are mostly wooded and will thereby provide natural screening and buffering of the sights and sounds caused by the extraction operations.

61.     Prior to the beginning of the actual extraction activities, trees and ground cover will be removed from a portion of the project area.  Top soil will also be removed and stockpiled on site within the excavated area so it may be used in reclamation of the excavated area.  Tree stumps, branches, and brush will either be chipped or buried on site; no burning of stumps or other cleared wooded material will occur on or off site.

62.     The three woods phases of excavation and extraction will occur first, beginning in the wooded areas farthest removed from the open meadows on the Lathrop plateau.  Due to the phased planning, the first fifteen years of extraction activities will occur south of the tree line separating the meadows from the wooded section, thereby allowing a fifty-foot-wide line of existing trees, brush, and ground cover to buffer the sound and sight of excavation and extraction activities.

63.     During each phase of Lathrop's extraction activities, no more than five acres of excavated area will be exposed at any given time, even when the excavated area is screened by wooded areas or earthen berms.  Once excavation is completed in a five acre area, the outer-most walls of the excavated area will be graded to a slope having a ratio of at least two feet across for every one foot of height.  The re-graded area with be covered with topsoil, seeded, and mulched, allowing ground cover to regenerate.  Lathrop and its experts have labeled this proposed practice as "progressive reclamation."

64.     Lathrop proposes to excavate the internal portions of the plateau area to about 100 feet deep, to an elevation of about 470 feet above sea level.

65.     The project site contains sand and gravel deposits that are very consistent.  Lathrop's expert, Mr. Revell, characterized these deposits as "homogeneous."  His characterization was not disputed by any witness and led the Court to conclude that following Lathrop's 30+ year plan of extraction to about 100 feet below the existing grade, about fifty feet of sand and gravel will remain in the excavated areas, leaving adequate protection of groundwater and the nearby New Haven River and an adequate buffer for possible future development of the site.

66.     When all excavation is complete, the excavated area will be near the elevation of the adjoining lands along South Street.  The floor of the excavated and reclaimed internal area will be generally level and have a general dimension of 1,100 feet (north to south) by 1,000 feet (east to west).

67.     Once all excavation and remediation work is completed, the project area will encompass an area of 1,100 to 1,000 feet in width to about 100 feet in height, thereby causing the excavated and reclaimed area to have a depth to width ratio of about 10:1.

68.     The external walls of the original plateau area will remain undisturbed and will form an earthen berm area around most of the finished project site.  The resulting lay of the land will be saucer-like, with an opening for the access road.  Lathrop has offered to excavate a portion of the resulting earthen berm along South Street, where the access road is sited, to improve the visual aesthetics and usability of the site for future development.  We conclude that this additional excavation will improve the aesthetics and usability of the site, and will allow the reclaimed project site to be more aligned with the lay of adjoining lands.

69.     The completed and reclaimed excavation area will not create a pit, as often occurs in some rock quarries, talc mines, and other sand and gravel extraction projects.  See Exhibit 5, at SP6–SP9.

70.     Lathrop proposes to operate its project on a seasonal basis, with excavation, extraction and sale of sand and gravel occurring from March 15th to December 15th each year.

71.     The hours of operation, including sales and delivery truck loading, will be from 7:00 a.m. to 3:30 p.m. on non-holiday weekdays and from 7:30 a.m. to Noon on Saturdays.  There will be no activities on the site on Saturday afternoons, Sundays, or holidays.

72.     Some activities will occur beyond these time frames for the following specific activities:

- site development and road construction: 7:00 a.m. to 4:30 p.m. Monday through Friday and 7:00 a.m. to 3:30 p.m. on Saturdays;

- general internal operations may begin at 6:30 a.m. on weekdays and 7:00 a.m. on Saturdays; and

- rock crushing activities will occur no more than twenty days per season and may only occur Monday through Friday, no earlier than 8:00 a.m. and no later than 3:00 p.m.

73.     There will not be any blasting on site during any part of Lathrop's proposed project. Lathrop originally proposed that blasting would occur on site and included blasting in the plans submitted with Lathrop's revised application for a state land use permit (Application No. 9A0315-2), but Lathrop has agreed to not allow any blasting activities in its project.

74.     Excavated material will be screened, sorted, and stored on site, in the area then being excavated.

ii. Phasing of Excavation and Extraction

75. After the access road, erosion prevention, sedimentation controls, and South Street improvements are constructed, Lathrop will begin its site preparations for extracting sand and gravel.

76. There will be a total of eight phases to the excavation and extraction work. As noted above, no portion of a phase with exposed sand and gravel will exceed five acres in size at any one time. As excavation work is completed in one of these five-acre areas, Lathrop will begin its "progressive reclamation" of grading and covering the exposed areas with top soil, often in areas of no more than one to two acres, then seeding and mulching the covered areas and allowing the natural ground cover to regenerate.

77. The excavation phasing will occur in two main sections: the woods section, located on the southern portion of the project site, and the meadows section, located on the northern portion of the project site.

78. The first three phases will occur in the woods section of the project and will take about fifteen years to complete. An overview of the first three phases, all within the wooded section of the project site and screened from views from the north by a fifty-foot buffer of existing trees, brush, and ground cover, are depicted on Lathrop's Phasing & Reclamation Plan (Woods Phases 1–3). Exhibit 5, at SP6.

79. The remaining five phases of extraction will occur in the meadows section and will take an additional fifteen to twenty-five years to complete. These remaining five phases of extraction will all occur in the meadows section of the project site and are depicted on Lathrop's Phasing & Reclamation Plan (Meadow Phases 1–2, 3–4, and 5–6). Exhibit 5, at SP7, SP8, and SP9.

80. Prior to beginning the initial extraction, Lathrop will delineate a fifty-foot buffer in the existing woods section that abuts the meadows section. This buffer of existing trees, brush and ground cover will serve as a sight and sound buffer between the area to be excavated and most off-site areas, such that the area from which sand and gravel will be extracted will be visually screened from nearly all off-site locations.

81. The initial phase in the woods section will occur in an area south of and behind this buffer of existing trees, brush, and ground cover. See Exhibit 5, at SP6. First, Lathrop will remove the trees, brush, ground cover, and topsoil from a section no larger than five acres in the

Phase 1 area. Id. The topsoil will be stockpiled in the excavated area, so that it will be available for use during reclamation. Sand and gravel will be extracted to a depth of about 100 feet, to about 470 feet above sea level, in the Phase 1 area.

82. Once all areas within Phase 1 have been excavated, extraction will occur within the Phase 2 area. During this process, no area will remain excavated and not reclaimed that is larger than five acres.

83. Excavation, extraction, and reclamation work will then move to Phase 3, also within the woods section.

84. When all extraction and reclamation is complete within Phase 3, excavation work will commence in the meadows section of the project site. Once the extraction activities begin in the meadows section, the excavation and extraction activities (estimated to begin in the sixteenth year of operation) will no longer be screened by the fifty foot wooded buffer and will therefore be possible to view, especially from higher elevations at the Ledges, the ice cream stand, and from the upper floors of one or more buildings behind the southern side of Main Street.

85. At the beginning of excavation and extraction in the meadows section, the work area will be partially screened by the earthen berm and trees on the Lathrop property, just north of the project site. These trees and the groundcover on the new earthen berms will have had a fifteen year span to establish and grow, since the berm and trees will have been constructed and planted at the beginning of Lathrop's construction. See Exhibit 8, at 2–3.

86. Each of the phasing plans depicts an estimated overview of the areas to be excavated during each phase, as well as a side-cut view of the resulting change in elevation. See Exhibit 5, at SP6–SP9. These side-cut views confirm that the excavated areas will most likely resemble a shallow saucer and not a pit. Id.

87. During the first phase of the meadows section excavation, the trees, brush, and ground cover that had previously been maintained as a screen for the excavated areas in the woods section will be removed. See Exhibit 5, at SP7.

88. What Lathrop has labeled "Phase 6" in the meadows section will not involve extraction activities. Phase 6 will occur after all extraction activities have been completed and will consist of final grading, seeding, and mulching of the internal slopes and floor, so that permanent reclamation may be completed to assure conformance with Lathrop's reclamation plan, and so that reuse of the property is more likely to occur. See Exhibit 5, at SP9.

iii. Site Activities and Equipment

89. Once the proposed project is fully operational, the extracted sand and gravel will be screened, sorted, and stockpiled in the excavated area for sale and loading onto haul trucks owned and operated by Lathrop. In rare instances, buyers of sand and gravel will receive loads of sand and/or gravel on their own trucks.

90. Lathrop has agreed to not allow blasting to occur on the project site.

91. The only sand and gravel sold from the project site will be that excavated from the project site. The only excavation of sand and gravel on the Lathrop project site for sale or use off-site will occur in the RA-2 District.

92. Some stone or gravel excavated on site will need to be crushed to allow the excavated material to be reduced to a proper size for sale. The material originally excavated that needs to be crushed will be stockpiled on site, so the crusher operation is kept to a minimum span of time and days. The crusher will operate on no more than twenty days during an operational season.

93. Some other excavated material, while not needing to be crushed, will need to be run through a screening machine, so that the excavated product can be sorted for sale.

94. The excavation will occur on site through the use of the following pieces of excavation equipment:[15]

     a. tree clearing equipment;

     b. one track excavator for clearing overburden[16] and for other on-site activities;

     c. one track dozer for clearing overburden and other on-site activities;

     d. one mobile rock crusher (which will only operate 20 days per year);

     e. one mobile screening unit;

     f. multiple two-axle loaders;

     g. heavy-duty, 40-ton haul truck that will remain on site; and

     h. multiple trucks used for hauling material off-site.[17]

---

[15] This is not intended to be an exact list; if and when this project begins, some other equipment may be substituted for the equipment listed here, but the number of pieces of equipment is not expected to significantly increase.

[16] Overburden is the earthen material below the topsoil and above the sand and gravel deposits.

[17] The haul trucks Lathrop intends to use for its extracted sand and gravel will be dump trucks having either two or three rear axles. These types of trucks are most accurately described as "medium trucks" and not "heavy trucks" under federal and state highway regulations and guidelines, which Lathrop's

95. While some noise calculations were premised upon the simultaneous operation of all on-site equipment, it is unlikely that all equipment will actually be operated simultaneously for anything more than an occasional, brief period of time.

96. Once operational, the extraction will be conducted by a four-person crew, per Lathrop's disclosure concerning Act 250 Criterion 9(A) in the Schedule B to its 2010 Act 250 application, a copy of which was admitted as Exhibit 4. Each employee may travel to and from the site by using their own personal vehicle.

### c. Reclamation and Post-Extraction Plans

97. Reclamation will occur according to Lathrop's "progressive reclamation" plan. When Lathrop wishes to extend its excavated areas within a given phase, or into a next phase, it will do so only after reclaiming a portion of a previously-excavated area, so that no total excavated area larger than five areas will be exposed at any one time.

98. Once all extraction is completed in all phases of the project, Lathrop will complete final grading of all slopes and any final seeding and mulching on both the sloped and floor areas of the project site. This will make the site suitable for future use or development. See Exhibit 5, at SP9 (depicting the final remediated area); Exhibit 5, at SM2 (depicting the soils map and elevations for the post-reclaimed areas of the project site).

99. Lathrop also proposes to plant several hundred trees on the earthen berms that are to be created during the construction phase of the project. See Exhibit 5, at SP5; Exhibit 8, at 2–5. These trees will become established and grow during the 30+ years that the project is operated, will contribute to the natural reclamation of the project site, and will return it to a partially wooded area.

100. Once reclamation is complete, the Lathrop site will be suitable for future use or development, including the conceptual residential development Lathrop depicted on Exhibit 5, at SM2 (2–4).[18]

---

traffic expert, Roger Dickinson, credibly explained. The trucks that Lathrop intends to use in the sale and delivery of sand and gravel are hereinafter referred to as "haul trucks."

[18] The development plans depicted on Exhibit 5, at SM2 (2–4) are not specific and only conceptual. Lathrop has not sought in the pending applications any authority to construct such a future development on its reclaimed site, and no such authority is given by this Decision.

**III. <u>Noise and Other Operational Impacts; Remediation Measures</u>**

101.    It is undisputed that the proposed project will bring additional traffic and noises to the area and will change the views that currently exist of the project site.

102.    Noise will be caused by both the initial construction and subsequent extraction phases of the project.  During extraction the noises will principally be caused by the equipment being operated on site and the crushing, screening, sorting, and depositing of sand and gravel into haul trucks. Noise will also be caused by those trucks travelling over the access road and the adjacent public highways, particularly South Street and Hewitt Road.

       i.   <u>Overview of Noise Measurements</u>

103.    The assessment of noise impacts from a project is complicated by many factors.  These include the actual noise emitted at the project, the distance from the project to a noise receiver, natural and man-made features between the project and a noise receiver that may dampen or amplify the noise, and the noises that already exist in the project neighborhood.

104.    The manner in which noise is emitted also complicates our analysis.  Some project noises, such as a truck engine, may emit a constant, low-level of noise.  Other project noises, such as the back up alarms installed on some excavation equipment, may occur infrequently, but are more disturbing because those noises can be piercing and unique to the area.[19]

105.    The manner in which noise is measured also impacts our analysis.  Noise is generally measured in decibels averaged over time ("dBA"); a decibel is a unit of measure generally recognized by experts specializing in noise analysis.  The following are basic assessments of noise levels:

    a.  an undisturbed quiet residence, with no passing vehicles or wildlife noises, can experience background noises as low as 20 dBA;

    b.  noises emitted at or below 40 dBA are unlikely to be noticed by an average person, sitting in an area with average background noise;

    c.  a passenger car travelling at 30 miles per hour ("MPH") is likely to emit noises from its engine, exhaust, and tires at about a 65 dBA level, when measured from about fifty feet away;

    d.  a truck travelling at 30 MPH is likely to emit noises from its engine, exhaust, and tires at about a 70–80 dBA level, when measured from about fifty feet away;

---

[19] We note, however, that noises from haul trucks and back-up alarms already exist in the surrounding neighborhood.

e. a truck travelling at 60 MPH is likely to emit noises from its engine, exhaust, and tires at about an 85 dBA level, when measured at about fifty feet away;

f. an average riding lawn mower, often used on residential properties, will emit about 90 dBA of noise, when measured at the lawn mower;

g. an average passenger vehicle horn emits a noise of about 100 dBA, when measured from ten feet away;

h. an average chainsaw will emit noise of approximately 110 dBA, as measured at the saw;

i. a hard-rock band can cause noise levels that exceed 120 dBA;

j. any noise above 130 dBA can cause physical pain;

k. a jet engine can register 140 dBA when measured while standing next to the engine; and

l. the nature of decibel measurement equates to a doubling of the noise level with every 10 dBA increase in the level of that noise.

Exhibit 28: PowerPoint presentation by Ken Kaliski, entitled "dBA Levels for Common Environments."

106. Few noises remain at a constant level over time, at least as perceived by the average person.

107. Because of the varying levels of noise over a period of time, even when that period is measured in seconds, several manners of measuring sound have developed, including:

a. "Lmin" which is used to describe the minimum noise level over the period of time being measured;

b. "Lmax" which is used to describe the maximum noise level over the period of time being measured;

c. "Leq" which is used to describe the equivalent noise level over a certain period of specified time, such as "Leq (1-sec)", which would denote the average noise level over a one second period, or "Leq(1)", which would denote the average noise level over a one hour period.

Exhibit 26: "Lathrop Sand & Gravel I Noise Assessment" by Ken Kaliski, at 4–5.

ii. Existing Neighborhood Noise Sources

108. Industrial activities and the associated truck traffic are not foreign to the area surrounding the Lathrop property and the roadways on which the Lathrop trucks will travel. Such noises have been present in this area for over seventy years.

109. Lathrop Forest Products and its predecessor—Claire Lathrop Band Mill—have conducted continuous operations in this neighborhood for at least the last forty years. During

34

that time, logging trucks and medium and heavy haul trucks, including trailer-pulling haul trucks, have travelled through this neighborhood and over the nearby town and state highways.

110.   Most recently, Lathrop Forest Products operates and causes truck traffic on area highways during the winter months, particularly January through March of each year, when its customers are most likely to purchase and use its wood chips. This operational season will mesh conveniently with Lathrop's proposed sand and gravel project, which will operate from March 15th to December 15th of each year.

111.   The industrial activities at the Lathrop Forest Products facilities include the sawing, de-barking, cleaning, and chipping of logs. Once timbers are sawn into lumber or chipped into wood chips, medium and heavy haul trucks travel over South Street, Hewitt Road, and the adjacent state highways. These activities bring the consequent industrial and traffic noises to the neighborhood.

112.   The truck traffic to and from Lathrop Forest Products has included logging trucks that brought in raw timber, trucks that hauled the wood chips, lumber, saw dust, and bark mulch produced by Lathrop away, and loaded trucks that visit the Lathrop Forest Products site on a year-round basis because it hosts the only truck weight scale in the region.

113.   During its most active period of operation (1990–1994), the Claire Lathrop Band Mill employed seventy people and used medium-sized, heavy, and tractor-trailer haul trucks to receive and deliver timber and wood products.

114.   Lathrop Forest Products caused one-way truck trips for its last fifteen years of seasonal operation that ranged from 4,414 trips per operational season to 7,325 trips per operational season. See Exhibit 33 (as explained and corrected by Jim Lathrop during his testimony).

115.   The logging trucks used to supply timber to Lathrop Forest Products are heavier and sometimes more noisy than the haul trucks to be used in the proposed sand and gravel extraction operation. State regulations allow general usage haul trucks with a maximum 80,000 lbs. weight limit to operate without first receiving an over-weight permit; logging trucks may operate without an over-weight permit when having a carrying capacity of up to 99,000 lbs.

116.   The haul trucks used to deliver the finished wood chips from Lathrop Forest Products are similar or larger in size, weight, and noise emission to those to be used for the proposed project.

iii.  Proposed Project Noises

117.    The proposed sand and gravel extraction operation will cause new noises in its neighborhood, including during construction and operation of the project.

118.    Once the sand and gravel extraction activities begin, activities on site will cause noises to emanate from the project site.  These noises will be caused by the equipment used to excavate downward into the plateau area of the project site, screen and sort the sand and gravel, crush larger stone or gravel (no more than twenty days per year), load the excavated materials into haul trucks, and grade, seed, and mulch the excavated areas as part of the progressive remediation process.

119.    These activities will cause noises to emanate from the equipment engines, exhaust, and tires, as well as the installed back-up alarms.  The process of loading the extracted sand and gravel into the haul truck beds will also cause noises that may be heard beyond the project boundaries, but these noises will be less loud and less piercing than the noises associated with a rock quarry, such as noises from blasting and the loading of large boulders into a haul truck bed.

120.    In particular, while some operational noises from the proposed project will be heard off site, Lathrop has pledged that the noises produced by its proposed project will not exceed 56 dBA (Leq), when measured at the nearest homes or outside areas of frequent human use.  Given the operational parameters and mitigation measures, it is realistic to expect that the project will not exceed Lathrop's noise limitation for operational noise.

121.    The noise levels from the equipment operating inside the project will rarely be significantly greater than the existing noise levels experienced at the nearest properties. Existing traffic, river flow, and neighborhood noises at homes closest to the Lathrop property were, for the vast majority of instances, measured during specific monitoring exercises as 55 to 57 dBA (Leq) respectively, including when measured at Leq (90), Leq (50), or Leq (10) rates.  See Exhibit 27, at 4–7.[20]

122.    Project noises heard at the homes closest to the project activities will vary as construction, excavation, and extraction progresses through the project site.  During initial

_____

[20]  Table 3, located in Exhibit 27 at 4, evidences several incidences of noise levels far exceeding 56 dBA (Leq), including two incidences where the noise recorded was about 78 dBA Leq (1 sec).  Mr. Kaliski credibly explained that these maximum noise readings were the result of one or more neighborhood dogs barking, as well as other noises not associated with the proposed project.

construction on and near South Street, the closest homes will be those located on Cold Spring Road and Lovers Lane. See Exhibit 21 at 1.

123. Noises from the project that reach other homes on properties beyond the adjacent neighborhood will be at lower decibels and may not be discernible above the existing background noises. Lathrop's noise expert credibly estimated that the adjacent homes that are not located on South Street or Cold Brook Road would not experience operational noises above 45 dBA (Leq).

124. Mr. Kaliski also conducted sound level monitoring exercises, using a piece of equipment (a loader) similar to the equipment to be used on the project site. The results of this monitoring exercise are described in his September, 2011 report, admitted as Exhibit 26. This monitoring exercise contributes to our conclusion that the operational noises within the project site will not cause noises at a level above 55 dBA, when measured at or outside the nearest homes. Outside other adjacent homes, the operational noises are unlikely to exceed 45 dBA. Id. at 13, Figures 4 and 5.[21]

    iv. Truck Noise

125. Lathrop did not initially consider or analyze the impact of noises from its haul trucks travelling on its access road and area highways. However, later in Lathrop's case-in-chief, Lathrop's traffic and noise experts, Roger Dickinson and Ken Kaliski, provided credible testimony and other evidence of the traffic that the project will cause and the noises generated by that truck traffic. These two experts' reports were admitted at trial as Exhibits 14 (Dickinson) and 26 (Kaliski).

126. The principal town highways over which the Lathrop trucks will travel are South Street and Hewitt Road. Once those trucks reach the end of Hewitt Road, they will continue to their final customer destination by using state highways, particularly Routes 17 and 116.

127. Most of the trucks used to haul the excavated sand and gravel from the Lathrop project site are classified as medium-sized haul trucks, having a hauling capacity of between 6 and 17

---

[21] Figures 4 and 5 show the results of noise monitoring during this exercise, measured both on site, about 110 feet from the equipment, and outside the nearest home, which is the Rueger residence on Cold Spring Road. The noises measured by the on-site monitor are noted by a red line on Figures 4 and 5 and are, of course, louder, since that monitoring equipment was nearest the noise-maker. Even though the monitor located at the Rueger residence was picked for its closest proximity to the proposed project, the distance, vegetation, and difference in elevation all contributed to damping the noise levels, as is evidenced by the blue lines on Figures 4 and 5.

cy; these trucks will be similar or smaller in size and capacity as the trucks currently used in the other Lathrop business operations on South Street.

128. The medium-sized haul trucks that Lathrop proposes to use will cause additional noises for the surrounding neighborhood. Generally, these trucks, operated at or below the posted speed limits (30 MPH for South Street; 35 MPH for Hewitt Road), will emit noises from the engines, exhaust, and tires at a level of 70 dBA (Leq) when measured at the edge of the roadway and at 56 dBA (Leq), when measured from the residences or outside areas that people frequent adjacent to the highways on which these trucks will travel.

129. Our findings as to the noise levels of project trucks were aided by the presence on these highways of similarly-sized trucks from the other Lathrop businesses. In particular, Lathrop's noise expert, Mr. Kaliski, provided credible testimony and demonstrative exhibits of the noise levels recorded by a monitoring station located adjacent to Cold Spring Road, across the Road from the Rueger residence, which is the closest residence to the project access road.[22]

130. This sound monitor reported average noise levels at the monitoring station in one second intervals at 55–57 dBA (Leq (1 sec.)) as fourteen trucks passed along South Street and Hewitt Road. Exhibit 27, at 3–4, Figures 2 and 3. These multiple truck trips caused noises at or near the level of existing noises heard at the Cold Spring Road monitor location.

131. The nature of noises caused by the passing trucks does not mean that the truck noises will not be discernible from the background noises that area residents hear; these residents will notice when a medium-sized Lathrop truck is passing on the area highways. But the level of noise is unlikely to be at a level above 56 dBA (Leq), which is similar to the level of noises already existing in this neighborhood.

    v.  Noise from Access Road Construction and South Street Improvements

132. As noted above at ¶37, we found credible the estimates from Lathrop and its experts that the construction of the access road is likely to be completed in a few months. All work on

---

[22] Mr. Kaliski's noise monitoring exercise and report conforms to the recommendations made by the District Commission. See Re: Lathrop Gravel, No. 9A0315-2, Mem. of Decision, at 7–9 (Dist. #9 Envtl. Comm. July 27, 2010). Lathrop also adopted the District Commission's recommendations for mitigation in the revised application (Exhibit 4), site plan (Exhibit 5), and Operational Parameters (Exhibit 10) it presented at trial, including the relocation of the access road away from Rounds Road and its residents, sound and sight mitigation in the form of new earthen berms and tree plantings at the initial stages of construction, the removal of blasting from its project plans, and a detailed presentation of a view shed analysis. Id.

and surrounding the access road and its intersection with South Street, including the improvements to South Street that Lathrop has agreed to complete, will take about twelve months to complete. Once this work is completed, all excavation activities will occur within the project site and the earthen walls that will surround it.

133. Because the access road must first be constructed before any extraction or hauling of sand and gravel can occur, the access road construction and South Street improvements will occur before the proposed project adds any truck traffic to the area highways.

134. The excavation equipment to be used for the construction of the access road and the South Street improvements will be similar to, and no larger than, the equipment used inside the excavation areas. The only characteristic of this work that will make its noise more noticeable to area residents is that the work will occur outside the walls, berms, and hillside growth that will buffer the noises from inside the excavation area. Thus, the noises from the access road construction and South Street improvements will be more noticeable to area residents, but will be of only a short and temporary duration.

135. Lathrop does not anticipate that any blasting will be necessary to complete the access road construction and South Street improvements.

136. The access road construction and South Street improvements will only occur within the operational times noted in ¶ 72, above.

vi. Other Aesthetic Impacts

137. No adjoining neighbors will see the Lathrop project in operation from their homes or outside their homes. There will be no change to the view they enjoy from inside or outside their residences.

138. No individuals are likely to see the project in operation from off site, at least for its first fifteen years of operation, particularly because of the fifty-foot wide wooded buffer that Lathrop will maintain between the wooded and meadow sections.

139. The earthen berms and trees to be planted on top of those berms will also provide screening for some of the excavation activities that occur in the sixteenth and later years of the project.

140. Some of the excavation and extraction work in the meadows section of the project, particularly the latter phases, will be visible from off site, especially from the Ledges area and

the ice cream stand on Main Street. However, views of the project from even these vantage points will be partially screened.

141. From the Ledges, the project will be a significant distance away; while visible at times, its view will only represent a small portion of the expansive view from the Ledges; that view will include far off agricultural fields, the commercial Village area, and a portion of the pre-existing Lathrop businesses.

142. The view of the project site from the ice cream stand is generally obscured, unless one purposefully looks for the project, in its later years of operation, from the fence near the ice cream stand. To observe the project site at that fence, one must also observe the pre-existing Lathrop businesses, which will be in the foreground of that view. The view of the project from this vantage point will not be out of character from the view that currently exists.

143. Mr. Moyers, who lives in the rehabilitated tower structure behind the south side of Main Street, will have a view of the project during its later years of excavation and extraction, especially from the vantage point of the higher levels of his tower. No other area resident spoke of a direct view of the project from their residence for any portion of the project while in operation.

vii. Remediation Measures

144. The view from South Street of the abandoned sand and gravel extraction operation will be improved by the access road construction and site rehabilitation work planned for the northern hillside of the project site.

145. Lathrop will minimize the amount of dust that is kicked up by the trucks from its proposed project by paving the access road from its intersection with South Street to where it descends past the plateau walls. Dust from the project trucks will also be minimized by Lathrop's pledge to cover all trucks leaving the project site with loads of sand or gravel.

146. For the first fifteen years of operation, nearly all of the excavation and extraction work will be shielded by a fifty-foot wide buffer that Lathrop will maintain between the excavated and unexcavated areas of the project. This wooded buffer will dampen and suppress the equipment and operational noises that will occur during the first fifteen years of operation.

147. The manner in which Lathrop has designed its extraction operations will also help to reduce the operational noises heard at the neighboring properties: Lathrop will not excavate from the hillsides on its property. Rather, Lathrop will construct its access road to the first and

subsequent phases of extraction at a below-grade level, so that the road construction work and daily operation of haul trucks will be shielded from all neighboring properties and most properties far removed from the Lathrop project site, at least until the haul trucks leave the project site.

148. Excavation in each phase will continue in a down-ward fashion, so that the extraction activities will be below the grade of the hillsides that surround the Lathrop project site.

149. Once excavation and extraction in the first phase is completed, excavation and extraction in the subsequent phases will occur (where possible) below the grade of the adjacent hillsides, thereby buffering noises emanating from those activities.

150. All crushing (occurring no more than twenty days per year), screening, and stockpiling of sand and gravel will occur at the lowest level of the excavated areas, so as to continue to provide a noise and view shield from most of the work phases.

151. During the access road construction phase, Lathrop proposes to construct two earthen berms outside the excavation area, near the northerly rim of the plateau on the Lathrop property. These berms will be graded, seeded, and mulched and trees will be planted on top of them. This will act as a noise buffer and view shield for portions of the excavation and extraction activities in the meadows section of the project. See Exhibit 8, at 2–4.

152. Lathrop also proposes to abide by the following practices that will mitigate project noises heard off site:

a. Lathrop shall provide any neighbor, whether or not a party to these appeals, the name and phone number of a site supervisor to lodge complaints.

b. If needed and available, use and maintain European-grade mufflers on all mobile diesel equipment. Europe has noise standards for construction equipment that are stricter than standards in the United States.

c. Activation of back-up alarms on all Lathrop trucks will be minimized by installing either broadband or radar-activated alarm switches, to the extent allowed by the U. S. Mine Safety and Health Administration.

d. Lay out truck routes within the excavated areas so that trucks do not have to back up before or after being loaded.

e. Do not permit the use of engine compression brakes [a/k/a "jake brakes"] on the access road, except in the case of an emergency.

f. Crushing and screening will only take place within the extraction walls and in a configuration that minimizes noise impacts to the extent that it is practical.

g. Keep the wooded buffer [on site between the woods and meadows sections] as long as practical.

Exhibit 28: PowerPoint presentation by Ken Kaliski, at 43–44.

153.    With these mitigation measures in place, the physical activities at the proposed project site will not cause noises that are at a decibel level significantly above the noise levels that already exist in the project neighborhood.

154.    As noted above in ¶¶ 97–100, Lathrop has proposed a "progressive reclamation" plan. This will limit the size of the excavated area to a maximum of five acres at any given time.  This will also help to mitigate any visual impacts from the project on the area.

## IV. Operational Traffic and Its Non-Noise Impacts

### i.  Project's Region of Operation

155.    The sand and gravel extracted from the Lathrop site will most likely be used by area towns and private parties for the construction and maintenance of public and private roads, septic systems, and residential, commercial, and industrial construction.

156.    Some of the already existing sand and gravel extraction operations in the area have either exhausted their deposits of earth resources or shut down for other reasons.  It is likely that the Lathrop project will supply sand and gravel to customers who previously purchased from those other operations that have since closed.

157.    While the Lathrop sand and gravel is expected to be of a high quality and consistency, it is unlikely that many customers will truck the sand and gravel from the Lathrop project for more than twenty miles.  While some customers may truck the Lathrop products to farther-away sites, the cost of trucking sand and gravel long distances is likely to cause most customers to only purchase and truck Lathrop sand and gravel to construction sites within that twenty-mile radius.

158.    Lathrop will use trucks to haul the extracted sand and gravel from its proposed project to its various customers in the Bristol area and beyond.  The trucks most often used will employ three axles (one front; two rear) with a total of six or ten wheels and a load capacity of 14 to 17 cubic yards of material; the weight loads of these trucks will have a maximum capacity of 80,000 pounds.[23]

---

[23] Some smaller trucks, having a hauling capacity of about 6 cy, may also be used, but Lathrop expects to most often use the larger capacity haul trucks.

42

159. Occasionally, larger capacity trucks, including tractor-trailer trucks, will be used to transport sand and gravel from the Lathrop site. These trucks will not be used unless and until all necessary local and state weight permits are received for their travel over town and state highways.

ii. Existing Use and Condition of Town Highways

160. The distance along South Street, from the Lathrop access road to the junction with Hewitt Road, is 0.2 miles. Lathrop trucks will travel 0.9 miles along Hewitt Road, from its beginning at the intersection with South Street, to its end at the intersection with Route 116.

161. Hewitt Road is a Class 2 Town Highway which has a paved width that varies between 21 to 25 feet and has a total area (in fee or easement) of about fifty feet. On either side of the paved areas along Hewitt Road, there are gravel and grassed shoulder areas of varying widths. In some places the gravel or grassed areas along Hewitt Road include generally level areas of five to seven feet in width before sloping down to a ditch or adjacent lands; some of the gravel and grass areas along Hewitt Road include little or no level areas before sloping downward.

162. Even where the gravel shoulders slope off quickly from Hewitt Road, this Class 2 town highway is a safe road on which all users have historically travelled. No accidents involving Lathrop trucks and other Hewitt Road users were reported for the forty-year period referenced during trial testimony.

163. Hewitt Road has clear sight lines and few blind curves. The land to either side of the road are often open lawns or fields; where the adjoining lands are wooded or over grown, the growth does not often encroach on to the paved travel lanes or shoulders. A number of photos of portions of Hewitt Road were offered by Lathrop and Neighbors, including Lathrop Exhibit 15. We have reached these factual determinations after having reviewed again all photos admitted at trial.

164. Hewitt Road has historically been used by passenger automobiles, delivery trucks, medium-sized trucks, heavy trucks, tandem-trailer trucks, bicyclists, pedestrians, joggers, runners, and horse-back riders.

165. Over the last several decades, the Claire Lathrop Band Mill and the Lathrop Forest Products facilities have employed logging trucks, some of which included tandem logging trailers, and medium to heavy trucks to receive raw timber logs and to send out finished timber and wood chips, saw dust, and bark mulch from the South Street facilities, over Hewitt Road,

on to Route 116 and beyond. These facilities cause an average of fifty to sixty one-way truck trips over Hewitt Road during their operational seasons. Most recently, Lathrop Forest Products has caused this type of truck traffic to travel over Hewitt Road during the months of January through March, which corresponds generally with the heating season for the schools, public and private facilities, and other customers for its wood chips.

166. There are about a dozen homes on or adjacent to Hewitt Road, as well as several commercial facilities; the latter are located near its intersection with Route 116.

167. While there are a wide variety of users on Hewitt Road, they appear to enjoy and use the road without conflict. Jim Lathrop and one of his drivers, George Forand, Sr., credibly testified that there has never been an accident involving other users of Hewitt Road and the trucks working for or doing business with the various Lathrop business entities. No other trial witness provided testimony that contradicted this point.

168. The posted speed limit on South Street, west of the access road and to its intersection with Hewitt Road, is 30 MPH. From that intersection, Hewitt Road has a posted speed limit of 35 MPH for its entire duration, ending at its intersection with Route 116.

169. Hewitt Road users generally observe the posted speed limit. There was no trial testimony of excessive speeding by vehicles on Hewitt Road or South Street.

170. Lathrop truck drivers have a history of courteous operation, particularly when they encounter pedestrians and other users of South Street and Hewitt Road. They have often given wide berth to others on these town highways and have often allowed opposing traffic to pass before the Lathrop trucks pass by pedestrians and others using the town highways. These facts were uncontested at trial; several Neighbors even testified to the safe practices and courtesy exhibited by Lathrop truck drivers.

171. Historically, South Street and Hewitt Road have received trucks that are not directly associated with the various Lathrop business entities. This additional truck traffic was more prevalent when the South Street bridge was open. Oil and gas delivery trucks, mail, UPS and FedEx trucks, and other vendors visit the homes and businesses along these town highways.

  iii. <u>Project's Estimated Traffic</u>

172. The operational season for the proposed project (March 15th through December 15th of each year), less federal holidays and Sundays, equates to 190 business days. Lathrop trucks will only operate on the town and state highways during these business days.

173.    Lathrop proposes that during the first fifteen years of operation, their proposed project will extract, sell, and truck off site a maximum of 60,000 cy of sand and gravel per year. During this period of time, Lathrop estimates that, on an average business day, 50 one-way truck trips will travel to or from the Lathrop site, meaning that about 25 trucks, on average, will leave the Lathrop site each business day, loaded with sand or gravel, and travel from the access road, over South Street and on to Hewitt Road. Once these trucks reach the end of Hewitt Road at its intersection with Route 116, the truck will travel north or south to their final delivery destination.[24]

174.    Lathrop requests that it be authorized to have a maximum of 140 one-way truck trips per business day that will travel to and from its proposed site during the first fifteen years of operation, meaning that a maximum of 70 trucks would exit the project site, loaded with sand or gravel, and travel over the identified town and state highways.

175.    During the first fifteen years of operation, it is unlikely that traffic flow from the Lathrop site will match this maximum for truck trips, since haul trucks with an average capacity of 14 cy of sand or gravel, making a total of 70 round trips to and from the Lathrop site, would exhaust the 60,000 cy annual extraction maximum within 62 business days (14 cy capacity trucks, making 70 loaded trips/day over 62 days would transport a total of 60,760 cy of sand or gravel). Thus, it is unlikely that the project will cause truck traffic that reaches the requested maximum of 140 one-way trips per day, if it intends to remain in operation for all or most of its full season of 190 business days.

176.    Stated differently, if Lathrop was able to average out its loaded truck trips equally over its first fifteen operational seasons, about twenty-three loaded trucks would travel from the Lathrop site per business day, which would equate to 46 one-way truck trips per day (60,000 cy annual capacity, loaded into trucks having an average capacity of 14 cy, equates to 4,286 truck trips per operational season; spread out evenly over 190 business days, equates to 23 loaded truck trips per business day).

---

[24] Even if the loaded trucks intend to travel north of the project site, the trucks will travel first on South Street and Hewitt Road, because the South Street bridge to the east of the access road has been closed for several years (and is likely to be closed for the foreseeable future), and Lathrop has pledged to not allow its trucks to travel along Lovers Lane, due to its narrowness and exclusive residential character.

177. In the operational years that follow (years sixteen and after), Lathrop proposes to increase its maximum extraction rates to 100,000 cy per year. If these estimated increases are realized, the number of trucks travelling to and from the project site will increase.

178. With the annual extraction rate increased to 100,000 cy, and using the same equations as employed above, truck traffic at the maximum rate would haul the equivalent of the 100,000 cy annual capacity in 102 business days; if the trucking of extracted sand and gravel were spread evenly over the 190 business days, an average of 38 loaded trucks would exit the Lathrop site on each day of an operational year, which would equate to 76 one-way truck trips.

iv. Impact from Project Traffic

179. Determining the impact of a proposed project on area highways does not simply involve the number of trips a project will generate. One must also consider the increase that the project traffic will represent in relation to the existing traffic on area highways.

180. Another factor to consider is the relative safety of the highways to be used, as well as the capacity of those highways and their intersections to receive additional traffic. The undisputed evidence at trial was that South Street and Hewitt Road are safe roadways and have not experienced any traffic delays or accidents, particularly involving trucks used by the existing Lathrop businesses.

181. Traffic experts frequently offer a way of assessing the impact of increased truck traffic by determining whether a highway intersection will suffer a degradation of its "level of service" ("LOS") because of the estimated increased traffic. This type of assessment has been employed by nearly all traffic experts who have appeared before this Court, as well as state and federal traffic officials, and is employed in guidelines established by those state and federal officials.

182. A highway intersection LOS is assessed on a scale of an "A" through "F" rating; an LOS A rating is only attributed to highway intersections that experience no delays or hazards; an LOS F rating is assigned to a highway intersection that has so much delay or hazard that it is deemed to be failed.

183. Lathrop's traffic expert provided credible evidence that that the intersections through which trucks from the proposed Lathrop project will travel currently provide a mostly positive LOS: most all intersections through which Lathrop trucks will travel enjoy an LOS A or B rating, with only one intersection currently experiencing an LOS C rating. Exhibit 14 at 5,

Table 4.[25]  The intersections along South Street and Hewitt Road through which the project trucks will travel currently experience a LOS A or B traffic rating.

184.    More to the point of our analysis, the most credible evidence presented convinced us that truck traffic from the proposed project, including occasional daily traffic at the level of 50 loaded trucks per business day (i.e.: 100 one-way truck trips per day), will not cause a change from the LOS rating currently experienced at the intersections of South Street, Hewitt Road, and Route 116.

185.    Lathrop has agreed to make improvements to South Street from the new access road to the intersection with Hewitt Road.  Specifically, the road will be widened to provide a 24 foot wide travel way and will have 3 foot wide paved shoulders on either side.  This will improve the safety of South Street for motorists, cyclists, and pedestrians.  Exhibit 14 at 6; Exhibit 5 at SP3.

186.    We have some concern, perhaps best explained as uncertainty, of the impact to area highways if the truck traffic from the proposed project continues at the projected maximum rate for more than sixty-two days a year.  See ¶¶174–178.  When Lathrop enters its sixteenth year of operation, it will be more likely that there will be a greater number of business days when the truck traffic exceeds 25 to 50 loaded truck trips per day.  Id.

### Conclusions of Law

In these consolidated land use appeals, this Court is charged with conducting a de novo review of the factual and legal determinations preserved for our review in each appeal.  10 V.S.A. §§ 8504(a) and (b); V.R.E.C.P. 5(g).  We are authorized to coordinate different appeals that concern the same project, when to do so "will promote expeditious and fair proceedings and avoid unnecessary costs or delay."  V.R.E.C.P. 2(b); see also 10 V.S.A. § 8504(g).  While these appeals have extended over many years, we remain convinced that by coordinating these appeals, including when addressing pre-trial motions, requests for amendments, interlocutory appeals, extensions, and for trial, the Court was able to address the appeals that remain in a more efficient manner than if we had not addressed them in a coordinated manner.

---

[25]  Table 4 shows that the only intersection that currently experiences an LOS C is the Route 116/17/Burpee Road intersection, which is an intersection through which some, but not all, of the Lathrop trucks will travel.  In addition, most all of the traffic concerns expressed at trial concerned project traffic on South Street and Hewitt Road.

Many of the factual characteristics of Lathrop's project and its impacts are relevant to and control our legal analysis on the varying legal issues that have been preserved for our review. We have therefore attempted to organize our factual determinations to provide a complete review of Lathrop's project and its impacts. We have organized our legal analysis based upon the claims presented in each appeal because of the different legal standards applicable to each claim. We first address Lathrop's appeal of the District Commission's decision on its state land use application. Second, we will review the legal issues raised by both the Neighbors and Lathrop in their respective appeals of the ZBA's decisions on Lathrop's municipal applications.

## I.    Outstanding Act 250 Criteria Compliance Issues

As noted above at pages 6–7, the District Commission concluded that Lathrop's revised application presented sufficient foundation for positive findings under a number of Act 250 criteria.[26] These initial determinations have not been challenged in these appeals and have therefore become final. V.R.E.C.P. 5(f); In re Shenandoah LLC, 2011 VT 68, ¶ 18, 190 Vt. 149 (holding that parties to appeal cannot make challenges based on issues not raised in the Statement of Questions). We therefore focus our analysis on the several Act 250 criteria that Lathrop challenged in their appeal.

a.   Criterion 5: Impacts on Traffic (10 V.S.A. § 6086(a)(5)).

The proponent of any project that is subject to Act 250 jurisdiction must show that the proposed project "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways . . . and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5). While applicants always bear the initial burden of producing some facts upon which a district commission (or this Court on appeal) may render positive findings, no project may be denied a permit solely for non-conformance with Criterion 5[27], and an opponent to a project bears the burden of proving non-conformance to Criteria 5 through 8. 10 V.S.A. §

---

[26] The District Commission concluded that Lathrop had satisfied the following criteria and that there was no need for specific Findings of Fact or Conclusions of Law: 1 (Water Quality), 1(A) (Headwaters), 1(C) (Water Conservation), 1(D) (Floodways), 1(E) (Streams), 1(F) (Shorelines), 4 (Soil Erosion), 6 (Educational Services), 7 (Municipal Services), 9(D) (Earth Resources), 9(F) (Energy Conservation), 9(G) (Private Utilities), 9(H) (Costs of Scattered Development), and 9(J) (Public Utilities). Re: Lathrop Gravel, No. 9A0315-2, Mem. of Decision, at 3–4 (Dist. #9 Envtl. Comm. July 27, 2010).

[27] 10 V.S.A. § 6087(b).

6088(b). The Vermont Supreme Court recognized that in analyzing Criterion 5 a decision maker must make a determination of the nature of the area impacted and the appropriate level of service for that area. In re Wal-Mart Stores, Inc., 167 Vt. 75, 86 (1997).

Neighbors presented several concerns about the traffic that the Lathrop project will generate in their neighborhood, emphasizing both the size and number of additional trucks. Their concerns are understandable, since most of the Neighbors live on or frequently visit Hewitt Road, South Street, and the surrounding area. These areas host school bus stops and are frequently used by walkers, bike-riders, and horseback riders.

We received no credible evidence of conflicts or congestion that would be caused by the Lathrop trucks. In fact, we received undisputed testimony, including from two Neighbors, as to the safety and courtesy already exhibited by the truck drivers employed by the existing Lathrop businesses. There was no evidence presented of accidents or unsafe operation in the forty or more years that Lathrop trucks have travelled these town highways. Mr. Lathrop credibly represented that the drivers he will employ at the proposed sand and gravel extraction operation will show the same care, respect, and courtesy to the other users of South Street and Hewitt Road as the drivers for the existing Lathrop businesses.

The existing Lathrop businesses, over their history of forty or more years, have generated thousands of annual truck trips on these town highways. The current Lathrop operations do not appear to generate as many truck trips as in previous years, but the average truck trips generated (about fifty one-way truck trips per day) are similar to the estimated average daily truck trips for the new Lathrop project. Further, the operational seasons for the existing Lathrop Forest Products operation and the proposed sand and gravel extraction operation barely overlap. Lathrop Forest Products' busiest months of operation and truck traffic are January through March while the proposed project will operate and generate truck traffic from March 15th through December 15th of each year. Thus, we received undisputed evidence that historically truck traffic has flowed at similar frequency over these town highways safely and with due respect for the area residents and other users of the roadway.

We were also provided with expert estimates that the proposed project will not cause unsafe conditions or unreasonable congestion. Evidence was provided that the proposed project will not cause a measurable difference in the level of service (LOS) at the South Street, Hewitt Road, and Route 116 intersections, even when the truck traffic reaches the estimated

maximum for the initial years of 100 one-way truck trips per day. No credible evidence was provided to suggest that the LOS would be impacted. Furthermore, Lathrop has agreed to undertake improvements to South Street. Finally, the total distance travelled by Lathrop trucks from the proposed access road to Route 116 is 1.1 miles (0.2 on South Street and 0.9 on Hewitt Road). We therefore conclude that the proposed project, when operating at no more than the maximum level of 100 one-way truck trips generated per day, conforms to Act 250 Criterion 5 as it will not cause unreasonable congestion or unsafe conditions on the town highways.

We are less certain that when the project's truck traffic increases to the projected maximum of 140 one-way truck trips per day it will still not cause unsafe conditions or unreasonable congestion. Such a level of operation could be nearly three times the average truck trips experienced per day for either the existing Lathrop businesses or the projected average for the first fifteen years of operation for the proposed project. We are simply uncertain, based upon the evidence presented, of what impacts this maximum truck traffic will cause. We conclude that whether the increased truck traffic should be permitted should be reconsidered after the project has operated during its first fifteen years. That way, the actual experience of the proposed project may be relied upon to determine whether the maximum extraction rate and truck traffic should be allowed.

We therefore only approve the project for a maximum annual extraction rate of 60,000 cy and a maximum truck traffic of 100 one-way truck trips per day. We <u>do not</u> deny Lathrop the ability to extract at an increased rate, or to include more than 100 one-way truck trips per day. Rather, we condition our approval here on the right of Lathrop to seek a permit amendment to increase its extraction rate and truck traffic in the sixteenth and subsequent years. If and when Lathrop seeks approval for such an amendment to its Act 250 permit, it may submit historical data of the project's impact upon area highways to the District Commission.

b. <u>Criterion 8: Impacts on Aesthetics (10 V.S.A. § 6086(a)(8)).</u>

A state land use permit may also only be granted when it has been determined that the proposed project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites, or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). As with Criterion 5, the burden of proof as to Criterion 8 rests with a project opponent, although the project applicant must satisfy the initial burden of producing evidence sufficient to support positive findings. 10 V.S.A. § 6088(b).

Neighbors' strongest concerns are that the proposed sand and gravel extraction operation, particularly due to its size and duration, will have several undue adverse impacts upon their neighborhood, Village, and Town. Neighbors are specifically concerned that the project will disturb the natural beauty and aesthetics of their community both visually and because of the project noise. Thankfully, our analysis does not need to be wholly subjective as our Supreme Court and the former Vermont Environmental Board have provided helpful precedent for analyzing Criterion 8.[28]

When a district commission in the first instance, or this Court on appeal, is attempting to determine whether a proposed project will have an "undue adverse impact," we are guided by the long-standing precedent established by the former Vermont Environmental Board, which provided the following definitions and explanations:

> The term "undue" generally means that which is more than necessary-- exceeding what is appropriate or normal. The word "adverse" means unfavorable, opposed, hostile. "Scenic and natural beauty" pertain to the pleasing qualities that emanate from nature and the Vermont landscape. In short, through Criterion 8 the Legislature has directed that no project within our jurisdiction be approved if it has an unnecessary or inappropriate negative impact on the enjoyment of surrounding natural and scenic qualities.

Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order, at 17 (Vt. Envtl. Bd. Nov. 4, 1985)(citation omitted).

The Quechee Board first attempted to determine whether a project's impact upon an area's aesthetics and scenic and natural beauty was "adverse" by assessing whether the project was "unfavorable, opposed, [or] hostile" and whether the project, if approved, would have "an unnecessary or inappropriate negative impact on the enjoyment of surrounding natural and scenic qualities." Id. We will first consider the visual impacts of the project on the surrounding area and then consider the impact of the noise from the project itself and the truck traffic.

In regards to the views enjoyed within the Village and surrounding areas, we cannot conclude that the Lathrop project will bring adverse impacts. The Lathrop project, especially

---

[28] There was no evidence presented at trial of any impact on historic sites from the proposed project. We therefore limit our analysis to the proposed project's impact upon the area's aesthetics and scenic and natural beauty. Lathrop's Question 2 in its Statement of Questions (filed Aug. 30, 2010) only poses the legal issue of the project's conformance with "§ 6086(a)(8), with respect to aesthetics" and the general understanding of the term "aesthetics" encompassed all applicable evidence presented at trial. We therefore focus our analysis principally on that term.

during its first fifteen years of operation, will not be within the view from most surrounding areas. In particular, the adjoining neighbors will not be able to view the Lathrop project from their properties. The off-site areas farther away from the project may have a view of some part of the Lathrop project, but it will often be obscured and any impact will be diminished by the distance between the observer and the Lathrop site.

When viewed from the fence line by the ice cream stand, an observer may have a slightly closer view of the Lathrop site. But from that vantage point, the Lathrop project site will be similar to the other business operations along South Street that will be in the foreground of the observer's view. To the extent that the Lathrop project can be viewed from off site, the impact of the Lathrop site will be diminished by distance and screening. Given the visual context of the area, including existing similar uses, the views of the project will not be unfavorable, opposed, or hostile to the surrounding aesthetics or scenic and natural beauty of this area.

We next consider the impacts from the project's operational noises and truck traffic. The evidence is generally undisputed that the proposed project will bring more noise and truck traffic to the area. In determining whether that additional noise and truck traffic will cause an adverse impact we take into account the existing noise levels in the surrounding area.

The former Environmental Board established specific noise standards (70 dBA (Lmax) at a project's boundary line and 55 dBA (Lmax) at adjoining residences) that have generally guided state land use determinations for the last thirteen years. Re: Barre Granite Quarries, LLC, et. al., No. 7C1079 (Revised)-EB, Findings of Fact, Conclusions of Law and Order, at 81 (Vt. Envtl. Bd. Dec. 8, 2000). However, after the Barre Granite decision, the Board emphasized that those specific noise level maximums should not be rigidly applied; that context and the setting of a proposed project must be considered. Re: McLean Enters. Corp., No. 2S1147-1-EB, Findings of Fact, Conclusions of Law and Order, at 64 (Vt. Envtl. Bd. Nov. 24, 2004)(noting that when a rock quarry is proposed for a quiet rural neighborhood that has no similar activities and often enjoys background noise levels under 30 dBA (Leq (90 sec.)), that a condition allowing the project to emit noises up to 50 dBA (Lmax) at nearby residences "may allow an undue adverse impact and may not be sufficiently protective"). The McLean Board provided further counsel against the rigid adoption of the specific noise levels established in Barre Granite when it noted that, "Of equal concern, a 50 dBA Lmax standard may not make sense in noisy areas . . . . It

may be of questionable logic and practically impossible to enforce a 50 dBA Lmax when trucks passing by . . . already register 78 dBA at an adjacent residence." Id.

Were we presented with an earth extraction project that was proposed for an area that had no such existing noises from commercial/industrial activities and no existing heavy truck traffic, our analysis would be different. But the neighborhood that will host the Lathrop project has experienced truck traffic and commercial-type noises for forty or more years, with no evidence presented of any clear adverse impacts from those existing businesses.

The noise levels estimated by Lathrop's expert were most credible and caused us to conclude that while an area resident or visitor will be able to discern some of the operational noises from the proposed project, those noises will be at levels that are similar to the background noises that already exist in this neighborhood. Specifically, Lathrop has pledged that the noises produced by its proposed project will not exceed 56 dBA (Leq), when measured at the nearest homes or outside areas of frequent human use. Even the noises from passing Lathrop trucks, loaded or unloaded, will be similar to the trucks and noises that already visit this area. Area background levels were measured at specific sites to be between 55 and 57 dBA (Leq).

These facts cause us to conclude that the operational and truck traffic noises from the proposed project will not cause an unfavorable, hostile, unnecessary, or inappropriate impact upon the surrounding aesthetics and scenic and natural beauty of the area. We therefore conclude that the operational and truck traffic noises will not be adverse.

Lastly, we conclude that the aesthetic impacts from the initial construction of the access road and improvements to South Street will not be adverse. The noises from this initial work may be more audible to area residents, due to the fact that the access road construction will not occur behind earthen berms or buffers. However, this construction work will only last a matter of months. As a consequence, the area where the access road will be constructed will be remediated and improved. We cannot say that a temporary, modest increase in noises from construction vehicles rises to the level of an adverse impact on this area, especially in light of the visual improvements the remediation will create.

Any analysis of noises from truck traffic generated by a project is necessary under Criterion 8, but it presents a somewhat unique legal analysis, since the noises being considered are not from the project site and project traffic often travels on public highways. When those

highways already host similar or larger trucks, it would be irresponsible for a district commission or this Court to require that a project's truck traffic abide by a noise level maximum that is lower than the level emitted from already existing traffic. See McLean Enters. Corp., No. 2S1147-1-EB, at 64.

An opposite conclusion on aesthetics in this appeal would be contrary to the spirit and intent of Criterion 8. Act 250 in general and Criterion 8 in particular were never intended to bar all development that may bring changes or increases in activities to an area. Re: Okemo Mountain, Inc., No. 2W5051-8-EB, Findings of Fact, Conclusions of Law and Order, at 9 (Vt. Envtl. Bd. Dec. 18, 1986). Rather, reasonable implementation of Vermont's state-wide land use law recognizes that development will occur as our state evolves; Act 250 has historically protected us from major development and land uses that will have undue, adverse impacts upon our communities, but has not barred future land uses that may bring some change to our communities without undue adverse effects.

Our determination that this project's impacts will not be adverse principally ends our analysis under Criterion 8. However, so that we may be assured that our Criterion 8 determinations are complete, we provide the following review of why we have also concluded that, even if some impacts from the proposed project were deemed to be adverse, the project should still receive approval under Criterion 8.

When a project is deemed to have an adverse impact upon an area's aesthetics or scenic, natural beauty, the district commission and this Court are then obligated to determine whether such adverse impacts are "undue." Our Supreme Court has summarized the standards first articulated in Quechee for determining whether an adverse impact was "undue" by explaining that:

> An adverse impact is considered undue if *any one* of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re: Appeal of Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8, 183 Vt. 336 (citations omitted).

Neighbors have repeatedly asserted that the proposed Lathrop project is barred by language from the Town Plan. However, we previously determined that the Town Plan

54

language referenced by Neighbors does not specifically prohibit sand and gravel extraction operations from the applicable zoning district. In re Lathrop Ltd. P'ship, No. 64-3-06 Vtec, slip op. at 4–10 (Vt. Envtl. Ct. Nov. 29, 2006)(Durkin, J.). Neighbors repeated these assertions at trial, but we received no evidence or arguments that convinced us to revisit and reverse this pre-trial determination. Furthermore, as discussed in greater detail in the following section, we find that the project conforms to the relevant zoning bylaws. We therefore conclude that the proposed project will not violate any "clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area." Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8.

Next, we cannot, given the context of the Lathrop project and the surrounding neighborhood, conclude that "the project [will] offend the sensibilities of the average person." Id. The project will be visible from some vantage points, especially after it enters its sixteenth year and extraction activities move into the meadows section. The distance between any vantage points and the project will limit any impact from the project. There will also be some operational noises, construction noises, and truck traffic noises that will be heard by area residents. But these project activities and noises are similar to the activities and noises that make up the existing working landscape of this Village and Town. Bristol has survived and even prospered in spite of, or perhaps because of, the already-existing sand and gravel extraction projects in the area, as well as the commercial businesses located along South Street and Hewitt Road. For that working landscape to continue, well-planned projects such as Lathrop's are needed. We cannot say that the sensibilities of an average person will be offended.

Lastly, we note that over the long history of these appeals, as well as the municipal and District Commission hearings that preceded these appeals, Lathrop has incorporated revisions to its project plans that have mitigated the potential impacts to its host community. The location of the access road has gone through several iterations, ultimately returning to the South Street site that Lathrop first proposed, but with improvements and mitigation measures added. This location is an improvement over the Rounds Road location, which was more isolated, would have included a much longer construction schedule, and would have caused additional adverse impacts, as found by the District Commission. Plus, the pending proposal includes reclamation of the un-permitted extraction site that ceased operation some twenty years ago.

55

The earthen berms Lathrop now proposes to add to the site along its northern boundaries will help lessen the visual and audible impacts from the project. These berms will help maintain the natural scenery of the project site and hasten its return to an area of natural growth. Once Lathrop's extraction is completed and a portion of the remaining side wall along South Street is opened (work that Lathrop did not initially propose, but did offer at trial), the project site will be better able to accommodate future uses than if the project was not completed. Lathrop's revised planning for how the extraction will be phased and how loaded trucks will be covered will reduce the impacts from this project. The use of European-style mufflers on all mobile diesel equipment, where available, will help dampen the noises emitted from Lathrop's equipment.

With all these mitigation steps in mind, we conclude that Lathrop has taken "generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." Id. We therefore conclude that, if the proposed project were to cause any adverse impacts to this area, those impacts will not be undue and that the Lathrop project, if constructed and used in accordance with the site plans and the conditions imposed in this Decision, will be in conformance with Act 250 Criterion 8.

c. Criterion 9(E): Impacts from Earth Extraction Projects; Remediation (10 V.S.A. § 6086(a)(9)(E)).

Act 250 Criterion 9(E) requires that a proposed earth extraction project satisfy two separate sub-criteria: (i) that the project "will not have an unduly harmful impact upon the environment or surrounding land uses and development;" and (ii) the proposed project includes "a site rehabilitation plan which insures that upon completion of the extracting or processing operation the site will be left by the applicant in a condition suited for an approved alternative use or development." 10 V.S.A. § 6086(a)(9)(E). For the reasons stated below, we conclude that the Lathrop project as proposed and conditioned conforms to Criterion (9)(E).

The Lathrop property is sited to take advantage of a topography that provides a unique isolation for the project, even though it is close to residential properties, area highways, and the vibrant Village area. Once construction of the access road and improvements to South Street are completed in the first several months, the proposed earth resources extraction will occur with little impact on area residents and visitors. The extraction operations will be difficult to see from any vantage point during its first fifteen years, due to the wooded buffer that will

56

screen the extraction area from view sheds to the north. Residents at neighboring properties will not be able to view the project, and will nearly not hear the operational noises within the project site, due to the surrounding wooded plateau hillsides. There was no evidence presented of runoff from the project site or encroachment into groundwater. We received no credible evidence that the surrounding environment will be impacted by this project. We therefore conclude that Criterion 9(E)(i) is satisfied.

The reclamation plans that Lathrop first proposed to the District Commission were deficient, as found by the Commission and admitted by Lathrop. But we previously ruled that Lathrop could address these shortcomings by providing a more detailed reclamation plan in its presentation before this Court in the de novo trial.[29] We found Lathrop's detailed trial presentation of its plans for reclamation of the project site and preparation for future use of the property to be complete and compelling.

By the time that Lathrop's extraction of earth resources from its property is completed, most all of the project site will have already been reclaimed, due to the "progressive reclamation" process Lathrop pledges to follow throughout its project's life. Lathrop's progressive reclamation plan will minimize the size of excavated areas that remain exposed at any given time to no more than five acres. This process will bring about two benefits: first, there will be the obvious benefit of limiting the area of raw, exposed earth that may be visible from the Village, the Ledges, and other off-site areas. Second, by conducting ongoing reclamation work as the project progresses, Lathrop will avoid facing a substantial reclamation task once the earth resources are depleted. This way, reclamation will occur while the project is generating income. We therefore are not inclined to impose a bond pursuant to Criterion 9(E)(ii) to assure Lathrop's reclamation work, given that if Lathrop abides by its project plans and permit conditions, the final reclamation work to be completed once extraction work is completed will be minimal.

Once the site is fully reclaimed, all disturbed areas will have been re-graded, covered with top soil, seeded, and mulched. Some areas will have had many years to reestablish the natural growth of trees, bushes, and ground cover. The earthen berms that Lathrop proposes to

---

[29] As discussed infra at pages 8–9, Neighbors have argued that Lathrop should be restricted in its presentation to the Court to that evidence it presented below. But for the reasons discussed above we declined to adopt Neighbors reasoning. We received no new evidence or legal arguments that caused us to reconsider and change this pre-trial ruling.

establish on its northern border during the initial phases will have had decades for the nearly two hundred trees to establish and grow on top of these berms. These components of Lathrop's mitigation and reclamation plans will allow the project site to return to a natural setting. The leveling of the project site to an elevation similar to that of the lands where South Street adjoins the property's northern border will help accommodate future development.

We are inclined to incorporate into our conditional approval Lathrop's proposal to remove a portion of the remaining earthen berm along South Street, but more specific plans need to be presented for this work. A final site that has a larger area open to South Street would provide a more appealing and accommodating context for the finished site, particularly for reclamation. We therefore direct that Lathrop revise its reclamation site plans to include detailed dimensions of this berm removal, so that this additional work may be incorporated into a final permit.

Based upon the above analysis, and conditioned upon Lathrop submitting the revised reclamation plans that incorporate the berm removal mentioned above, we conclude that Lathrop's project as proposed and otherwise conditioned conforms to Act 250 Criteria 9(E).

d.  Criterion 9(K): Impacts Affecting Public Investments (10 V.S.A. § 6086(a)(9)(K)).

In addition to the aesthetic impacts of a project's traffic (reviewed under Criterion 8), and that traffic's impact upon highway safety and congestion (reviewed under Criterion 5), we are charged with determining a project's impact upon various public investments. In its decision below, the District Commission determined the public investments that may be impacted by the Lathrop project were the nearest public highways, which under Lathrop's revised plans include the 0.2 mile stretch of South Street and the 0.9 mile stretch of Hewitt Road over which the project trucks will travel. That determination of what public investments may be impacted was not challenged by any of the pending appeals and is therefore now final. We therefore next consider how the proposed project will impact those portions of South Street and Hewitt Road.

We are specifically directed to determine whether the proposed project will "unnecessarily or unreasonably endanger the public or quasi-public investments in the [identified] facility, service or lands, or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to the facility, service or

lands." 10 V.S.A. § 6086(a)(9)(K). For the reasons detailed below, we conclude that the project as proposed and conditioned conforms to Criterion 9(K).

Our analysis here is made more succinct by the review we have already conducted under Criterion 5. When considering the impact upon a state or local highway, as a public investment, review can be similar under Criteria 5 and 9(K). Re: Pittsford Enters., No. 1R0877-EB, Findings of Fact, Conclusions of Law and Order, at 36 (Vt. Envtl. Bd. Dec. 31, 2002). The Board in Pittsford Enterprises did recognize that there are important differences between the analysis under Criteria 5 and 9(K), specifically the standard under Criterion 9(K) is higher than under Criterion 5 as it requires "material jeopardy or material interference." Id. As noted above, we have concluded that the truck traffic that will be generated on South Street and Hewitt Road when up to 60,000 cy of extracted material is trucked off site per operational season will not cause a diminution in the safety or LOS on those Class 2 town highways. In addition to the findings that the LOS and safety will not be adversely affected, we received no evidence of the project "endangering" or damaging these town highways. Additionally, Lathrop has agreed to undertake improvements to South Street. We therefore conclude that that the project as proposed and conditioned conforms to Act 250 Criterion 9(K).

e.   Criterion 10: Conformance with Town and Municipal Plans (10 V.S.A. § 6086(a)(10)).

The Town Plan (a copy of which was admitted at trial as Exhibit 2) is self-described as "a statement of goals, policies, strategies and programs adopted by [its] citizens . . . to guide future growth within" the Town. Town Plan at 1. This Town Plan, as with most town plans, offers generalized goals and philosophies on desired land uses and does not contain the specific authorizations and prohibitions contained in zoning regulations. While our responsibility here is to determine whether the proposed project "conforms" to the Town Plan, we must maintain the discipline to not employ the aspirational language in the Town Plan as a substitute for the specific review of a project that is required under the applicable zoning regulations.

As noted above at pages 5–7, we previously addressed the question of how the Town Plan should be interpreted in relation to the proposed project. See In re Lathrop Ltd. P'ship, No. 64-3-06 Vtec, slip op. at 4–10 (Vt. Envtl. Ct. Nov. 29, 2006)(Durkin, J.). We began by making reference to the two-step analysis required under Criterion 10, as announced by the former Environmental Board:

59

a determination must first be made as to whether the applicable language from the [town p]lan is "mandatory or . . . merely provide[s] guidance." Second, the Board directed that a determination must be made as to whether "the town plan's provisions [are] specific or ambiguous."

Id. at 5, quoting Times and Seasons, LLC and Benoit, No. 3W0839-2-EB, Findings of Fact, Conclusions of Law and Order, at 58 (Vt. Envtl. Bd. Nov. 4, 2005).

The Times and Seasons analysis is particularly relevant when analyzing whether a town plan provision prohibits a specific land use activity. Since the Neighbors' challenge to Lathrop's Act 250 application included a claim that the Town Plan prohibited the project, we employed the analysis suggested by the Supreme Court.

We then conducted a detailed review of the applicable language from the Town Plan. In relation to the only zoning district in which Lathrop proposes to conduct excavation and extraction, the RA-2 District, we previously noted that the Plan provides that:

Much of the RA-2 (Rural Agricultural, 2 acre) district consists of areas where soils possess good-to-moderate capability for on-site sewage disposal and where direct access from existing town roads is available. The district is intended to be primarily a mix of residential and agricultural uses with cluster development desirable. Additional requirements for this district are given in 5.1.2 below.

Lathrop Ltd. P'ship, No. 64-3-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. Nov. 29, 2006)(Durkin, J.) quoting the Town Plan at § 5.1.1 (emphasis added).

We concluded that the Town Plan does not, as asserted by Neighbors, restrict development in the RA-2 District to *only* agricultural and residential uses. Id. at 6. We received no additional evidence or legal arguments at trial that convinced us to revisit and change our interpretation of this provision from the Town Plan.

The Town Plan continues with its explanation that "[w]ithin the RA-1, RA-2 and RA-5 districts, commercial development will be controlled through the conditional use process." Town Plan at § 5.1.2. Unfortunately, the Town Plan does not define the term "commercial development." We have already addressed this issue in our review of the first Act 250 appeal: Lathrop Ltd. P'ship, No. 64-3-06 Vtec, slip op. at 6–7 (Vt. Envtl. Ct. Nov. 29, 2006)(Durkin, J.). We concluded that the term "commercial development" included development for industrial or manufacturing uses. We did so based on rules of statutory construction. We found that the common use of the term "commercial development" included more than just commercial *uses* as defined in the Bylaws. We also found that looking at the Town Plan as a whole, Section 5 should not be read as a prohibition on industrial or manufacturing uses in the RA-2 district. To

the extent that the term "commercial uses" as defined in the Bylaws would alter this determination, we found that because the Bylaws specifically allow sand and gravel extraction operations in any district subject to conditional use review, the Bylaws resolve any ambiguity in favor of Lathrop. Id.

The somewhat strict reading of a town plan required by the Times and Seasons Board may seem harsh, but it has a foundation in fairness. When a community chooses to specifically limit or exclude certain uses or development from certain town districts, it must provide direct, explicit language, so as to put property owners on notice as to what uses or developments may be prohibited on their property. Similarly, by using non-mandatory language, such as "primarily" or "should", and providing a means by which commercial development may be allowed through the conditional use process, the Town has provided notice that some "commercial development," as that term is generally defined, will be allowed in the identified zoning districts. In regards to the stated goal that the RA-2 District remains "primarily a mix of residential and agricultural uses,"[30] we note that the RA-2 District in general and the areas along South Street and Hewitt Road in particular will continue to be "primarily" areas of residential and agricultural uses. The introduction of the Lathrop project, as proposed and conditioned, will not have so significant an impact upon these areas as to change their primary characteristics.

We therefore conclude that our original assessment in 2006 was correct: the Town Plan does not prohibit the proposed Lathrop project from occurring in the RA-2 District.

Neighbors renewed at trial the claim asserted by Mr. Moyers in his cross-appeal in the first Act 250 appeal that the access road does not conform to the Town Plan. Specifically the question is this: since Lathrop's access road is located in an adjoining zoning district, the MIX District, and since the Town Plan recommends that "heavy manufacturing" not be permitted in the MIX District, should the access road be regarded as not conforming to the Town Plan, since it serves a "heavy manufacturing" use?

The District Commission reasoned that, even though "heavy manufacturing should[31] not be permitted" in the MIX district (Town Plan § 5.1.1) the proposed access road is not prohibited

---

[30] Town Plan § 5.1.1.

[31] We regard the term "should" as advisory in nature. It does not denote the mandatory characteristic of the word "shall," which the Town Plan drafters were certainly free to use.

by the provisions in the Town Plan relating to lawful uses in the MIX district. The District Commission explained that:

> the only activity occurring within the MIX District involves the construction of the access road, grading and reclamation. There are no plans to use the area within the MIX District for any use other than providing access to the sand and gravel pit within the RA-2 District. A majority of the Commission finds this activity consistent with the objectives of the MIX District provided there is no quarrying in the MIX District.

Re: Lathrop Gravel, No. 9A0315, Mem. of Decision, at 12 (Dist. #9 Envtl. Comm. Mar. 16, 2006).

In considering this argument we note that the Town Plan uses the term "heavy manufacturing" but does not define that term. Bylaws § 130 uses the term "quarries" in defining "heavy manufacturing or industry" and further includes in its definition of "quarrying" the term "extraction of soil, sand or gravel." This does not resolve the issue though as "heavy manufacturing or industry" as used in the Bylaws could be read as broader than simply "heavy manufacturing" as used in the Plan. Furthermore, the question remains as to whether the access road serving a "heavy manufacturing" use is itself prohibited in the MIX district. We therefore reasoned that the Town Plan provisions were not so specific as to prohibit an access road located in the MIX District. We received no evidence or arguments at trial or after that caused us to change this assessment.

The Town Plan encourages an "economic climate [that] would foster locally owned and entrepreneurial enterprises" and allows for the Town and its citizens to "remain independent and self-reliant." The Lathrop family has maintained and grown various businesses in Bristol for generations. That long a business history can often result in complaints or resentment, but we received no such evidence at trial. Even some of the Neighbors, while concerned enough to object to Lathrop's plans, spoke in a complementary fashion of the manner in which the Lathrop family has conducted its current businesses. The Lathrop project, provided it is constructed and operated as represented and conditioned, will contribute to the Town attaining these stated goals. For all these reasons, we conclude that the Lathrop project as proposed and conditioned conforms to the Town Plan.

In light of our determinations on the Act 250 criteria that were appealed here, and in consideration of the positive Findings, Conclusions, and other determinations made by the District Commission that were not challenged in this appeal, we conclude that the project as

proposed and with the conditions imposed by this Decision conforms to all applicable Act 250 criteria.

## II.     Neighbors' Claims of Non-Conformance with Certain Bylaw Provisions

Neighbors presented witness testimony and other evidence to address the legal issues preserved for our review in their appeal of the ZBA's approval of Lathrop's first application and to respond to Lathrop's appeal of the ZBA's denial of its revised application. Where the legal issues raised by Lathrop and Neighbors overlap, we consolidate our review below. However, because the legal issues in the parties' respective appeals do not completely overlap, we recite the legal issues raised by each party below and address them in turn.

The legal issues Neighbors preserved for our review in their Statement of Questions (filed on Dec. 13, 2005 in Lathrop I, No. 122-7-04 Vtec) are summarized above at pages 14-15. Neighbors also summarized these legal issues in their post-judgment memorandum, as noted above at pages 14-15, fn. 12, and we rely upon that summary in organizing our discussion of the remaining issues from Neighbors' municipal appeal.

1.  Is the project permitted in the RA-2 and MIX Districts?

The uses specifically permitted in the RA-2 and MIX Districts are identified in Bylaws §§ 1002 and 1012, respectively. Neither provision specifically lists sand and gravel extraction operations as either a permitted or conditional use. In fact, sand and gravel extraction is not specifically listed in any zoning district in Bristol. But, that does not end our analysis, because Bylaws § 526 provides for sand and gravel extraction operations "in any district," provided the operation receives conditional use approval pursuant to the applicable Bylaws provision (Bylaws § 341) and the enabling statute,[32] and satisfies the ten additional requirements under Bylaws § 526.

We previously addressed the general legal question of whether a sand and gravel extraction operation could be permitted in one or both of these zoning districts. See Lathrop I, No. 122-7-04 Vtec, slip op. at 3–4 (Vt. Envtl. Ct. May 5, 2005). We received no new evidence or legal arguments that caused us to reconsider and reverse our 2005 analysis on this issue. Thus,

---

[32]  Bylaws § 526 make reference to the enabling statute formerly known as 24 V.S.A. § 4407(8). The provisions of title 24 were reorganized as part of the Permit reform Law of 2004; the provisions authorizing municipalities to enact conditional use approval for certain types of land development are now located at 24 V.S.A. § 4414(3).

we answer Neighbors' Question 1 in the affirmative: the Lathrop project may be permitted as proposed, conditioned, and situated in the RA-2 and MIX Districts, provided it is found to satisfy the conditional use and extra requirements of Bylaws § 526. We leave our specific analysis of the project's conformance with the ten additional requirements of Bylaws § 526 and the conditional use criteria in Bylaws § 341 to our analysis of legal issues Lathrop raises.

2. Is the project a "pit"?

Bylaws § 526(2) provides, in pertinent part, that a sand and gravel project may not be permitted if it will involve "[t]he digging or creating of pits or steep slopes . . . , unless provision is made to refill such pit." In a separate subsection, Bylaws § 526 appears to provide a reference to what may be considered a "steep slope" by noting that "[a]ll excavation slopes in excess of one to two shall be adequately fenced as determined by the Administrative Officer." Bylaws § 526(7).

The parties argued extensively about this legal question before, during, and after trial, for an obvious reason: if Lathrop's project creates a pit or steep slope, that pit or steep slope must be refilled. The trucking of material to refill the pit, likely from off site, could require at least a doubling of truck traffic on town highways, at considerable expense to Lathrop. The refilling process could also adversely impact area residents.

We respect the sincere testimony and legal arguments presented by all parties, but rely upon a straight-forward factual determination to answer this Question: Lathrop's project as proposed and conditioned will not create a pit or steep slope. Bylaws § 526(2) therefore does not require Lathrop to refill its extraction area.

The excavated area, both during the project's lifetime and upon its reclamation, will not result in any slope in excess of a 1:2. Once the project is complete, the project area will rise one foot of height for every ten feet across. This project will result in a land formation that resembles a shallow saucer, as asserted by Lathrop.

Once fully reclaimed and after a portion of the northern berm is removed in the access road area, the project will provide an open area with a natural regrowth of trees and ground cover. The area can then be held as open land, as it is now, with the possibility of future permitted development. Lathrop has presented credible evidence to confirm that its project, as now proposed and conditioned, conforms to Bylaws § 526(7), since the project will not result in a pit or steep slopes and therefore need not be refilled.

Several parties and the Court were at times perplexed by the requirements of Bylaws § 526(7), but the provision appears to have a rational foundation based upon public safety: a quarry or pit, when left behind, can present a hazard to the public by its mere existence, particularly as an attractive nuisance. Pits in particular can cause damage and create hazards to public and private property when allowed to fill with storm and ground water, as evidenced in In re Hamm Mine Act 250 JO Appeal, No. 271-11-06 Vtec, slip op. at 6 (Vt. Envtl. Ct. May 15, 2008) (Durkin, J.). This foundation reinforces our conclusion here: Bylaws § 526(7) does not require refilling because the Lathrop project will create neither a pit that could fill with water and then breach nor steep slopes that could become dangerous attractive nuisances, which are the public safety concerns that Bylaws § 526(7) appears to address.

3. <u>Has Lathrop adequately addressed all health, safety, noise, air and water pollution concerns?</u>

Read together, Bylaws §§ 341 and 526 govern conditional use approval for sand and gravel extraction operations[33] and provide the jurisdictional authority to review the legal issues that Neighbors raised in this consolidated Question. Since we provide a detailed analysis of those two Bylaw provisions in the following subsection, we do not provide analysis here so as to avoid repetition. For all the reasons expressed below, we conclude that the Lathrop project, as proposed and conditioned, adequately addresses all health, safety, noise, air, and water pollution concerns that the applicable Bylaw provisions provide us the jurisdictional authority to address.

4. <u>Is the project an extension of a prior nonconforming use?</u>

Lastly, we revisit the question of whether the project as proposed constitutes an extension of a prior nonconforming use, an issue raised several times in pre-trial motions, as well as during trial and in post-trial briefs. Here, Neighbors refer to the prior sand and gravel extraction operation that evidence at trial showed existed without the benefit of state or local permits, beginning around 1970 and ending sometime around 1990. We addressed this issue most substantively in our 2005 Decision on pre-trial motions for partial summary judgment, filed by Lathrop and Neighbors in the first appeal of the municipal permit application. Lathrop I, No. 122-7-04 Vtec, slip op. at 5 (Vt. Envtl. Ct. May 5, 2005). Neighbors argue that the new

---

[33] Bylaws § 810, which is also addressed in the following sub-section, also addresses noise concerns.

project is an unlawful extension of a prior, un-permitted, and now nonconforming use, since the access road for the new project will be constructed where the old operation once existed.

The parties appear to agree on several material facts, including that the prior operation was nonconforming to existing regulations, and that it ceased operation sometime around 1990. We did not reach the legal question of whether the prior operation constituted a legal or illegal nonconforming use, since the principal legal question was whether the proposed project constituted an extension of the old operation, legal or not. Bylaws § 512 specifically restricts the re-establishment of prior nonconforming uses when those uses have been discontinued for one year or more. Because the prior operation was discontinued over twenty years ago, we concluded that under Bylaws § 512 the new project cannot be a lawful re-establishment of the prior operation. Furthermore, Lathrop proposed a project that is considerably different than their prior proposal, including that the pending application evidences a project that conforms to current law.

We received no evidence or legal arguments at trial that caused us to reconsider and reverse our 2005 determination. We therefore answer this last Question from Neighbors' appeal in the negative: the Lathrop project, as proposed and conditioned, is not an extension of a prior nonconforming use.

### III. Lathrop's Claims of Conformance with Certain Bylaw Provisions

Lathrop appealed the ZBA's denial of its revised application for a municipal zoning permit and secured several legal issues for our review by filing its Statement of Questions on December 9, 2008. Several of those legal issues have already been addressed in the Discussion sections, above. We list each of Lathrop's legal issues below to ensure our complete review.

1. Does the proposed project comply with Bylaws § 526?

Bylaws § 526 authorizes proposed sand and gravel extraction operations in any zoning district in Town, but only if the proposal satisfies the conditional use criteria in Bylaws § 341 and the ten additional standards in Bylaws § 526. We first address those ten additional standards and then address the conditional use criteria of § 341 in our discussion of Lathrop's second legal issue, below.

i. Bylaws § 526(1):

Subsection (1) directs that an applicant "may" be required to deliver a "performance bond," presumably to the Town, "to ensure that upon completion of the extraction operations

the abandoned site will be left in a safe, attractive and useful condition in the interest of public safety and general welfare." Id. The amount and terms of the bond are to be based upon a "plan of proposed improvements" that an applicant is directed to submit, again presumably to the Town. Id. "If" a bond is required, "it shall be sufficient to cover the cost of the plan." Id.

Lathrop plans to conduct its reclamation work on an on-going basis by re-grading the excavated site, which Lathrop pledges to always limit to a maximum of 5 acres in size), covering with stockpiled top soils, seeding, and mulching. That way, Lathrop will incur the expense and complete the reclamation work while the project is on-going and generating income. We therefore noted at page 58, above, in our discussion of Act 250 Criterion 9(E), that we were not inclined to impose a bond for completion of reclamation work.

Three factors cause us to revisit the issue of requiring a bond. First, while the language of Bylaws § 526(1) is permissive, with its use of the verb "may," we are inclined to respect the recommendation of the Town, made through its duly adopted Bylaws, that a performance bond should be considered. Second, Lathrop represented during trial that it would be willing to secure and submit a performance bond, although the amount and terms of the bond were not specified. Third, we note that while Lathrop's plans call for reclamation to commence and continue once its extraction operations begin, there will be substantial work occurring in the initial phases of construction that will expose raw earth before Lathrop's reclamation work begins.

Because of these factors, we conclude that Lathrop should be required to secure a performance bond, as authorized by Bylaws § 526(1). The amount and terms of the bond should be based upon the plan for improvements Lathrop delivers to the Town, which shall include an estimate of costs for such improvements, concerning the access road construction, remediation of that site, improvements to South Street, and an estimate of the cost of the work required to complete reclamation after all extraction work is complete, as is summarized in Lathrop's proposed Phase 6 in the meadows section. The amount of the bond may be reduced as the specified work is completed. The annual report Lathrop submits to the Town, referenced in Lathrop's proposed Operational Parameters in Exhibit 10, shall include an annual certification of the bond.

ii.     Bylaws § 526(2):

Subsection (2) requires that removal of material results in the "improvement of the land" and that any resulting pits or steep slopes are refilled.  As detailed above, Lathrop's plan for construction, improvements, excavation, extraction, and reclamation provides for measured slopes on the internal walls of the project site and will result in improvement of the impacted land, particularly the land left exposed from the prior extraction activities along the northern border of the property.  No steep slopes or pits will be created.  Therefore, no refilling will be required.   The project as proposed and conditioned conforms to all provisions of Bylaws § 526(2).

iii.     Bylaws § 526(3):

Bylaws § 526(3) requires that excavation sites are "graded smooth and left in a neat condition" and that the site is "fertilized, mulched and reseeded so as to established [sic] a firm cover of [vegetation]" to control erosion.  Lathrop's plans call for appropriate grading and progressive reclamation of the impacted areas, including mulching and reseeding.  Their plan will leave the site in a neat condition.  Their erosion control plans for the construction and operational phases are complete and credible.  The project as proposed and conditioned conforms to all provisions of Bylaws § 526(3).

iv.     Bylaws § 526(4):

Surface drainage at the project site, to the extent that there is any, will be contained within the shallow saucer area that will be formed out of the plateau area of the project site. Lathrop has proposed sufficient drainage and erosion control plans to assure that whatever runoff or drainage occurs in the impacted areas will be appropriately collected and treated so as to prevent the flow of erosion debris and loose material.  The project as proposed and conditioned conforms to all provisions of Bylaws § 526(4).

v.     Bylaws § 526(5):

Lathrop will no longer conduct any blasting during any phase of the planned construction, roadway improvements, excavation, extraction, or processing of extracted materials.  All excavation and stockpiling of materials will occur beyond the two hundred foot setback area from any road or property line. The project as proposed and conditioned conforms to all provisions of Bylaws § 526(5).

vi.  Bylaws § 526(6):

Lathrop proposes to employ a power-activated crusher (for no more than twenty days per operational season) and sorting equipment within the project site. These pieces of equipment will be located no closer than three hundred feet from any road or property line and will be equipped with satisfactory dust elimination systems. The project as proposed and conditioned conforms to all provisions of Bylaws § 526(6).

vii.  Bylaw § 526(7):

No excavated areas will be in excess of a 1:2 slope; fencing is therefore not required under this Bylaw provision and none is called for in Lathrop's plans. The project as proposed and conditioned conforms to all provisions of Bylaws § 526(7).

viii.  Bylaws § 526(8):

No extension of an existing non-conforming operation is proposed. The project as proposed and conditioned conforms to all provisions of Bylaws § 526(8).

ix.  Bylaws § 526(9):

No stripping of top soil for sale off site is proposed; Lathrop proposes to strip and stockpile the top soil from the project site so that it may be used during its planned progressive reclamation. The project as proposed and conditioned conforms to all provisions of Bylaws § 526(9).

x.  Bylaws § 526(10):

Bylaws § 526(10) authorizes the ZBA, and this Court on appeal, to "attach any additional conditions as it may find necessary for the safety and general welfare of the public." We have incorporated several conditions into our approval here; some based upon recommendations made by Lathrop's representatives and others upon Neighbors' recommendations. Some of those conditions provide protections for the public's safety and general welfare. We therefore conclude that the project as proposed and conditioned conforms to all provisions of Bylaws § 526(10).

Based upon these determinations, we conclude that the project as proposed and conditioned conforms to all portions of Bylaws § 526.

2. Does the proposed project comply with Bylaws § 341?

Bylaws § 341 provides both general and specific standards that must be satisfied for any project that is authorized as a conditional use. Since sand and gravel extraction operations may

only be permitted "in any district" within the Town "after conditional use review and approval," pursuant to Bylaws § 526, we next conduct a review of each of the § 341 conditional use standards.

## A. General Standards (Bylaws §§ 341(2)(a) through (d))

The general conditional use standards require a determination that the proposed project "shall not adversely affect" the following community qualities or characteristics: (1) "capacity of existing or planned community facilities"; (2) "character of the area affected"; (3) "[t]raffic on roads and highways in the vicinity"; and (4) "(b)ylaws then in effect." Id. The language "shall not adversely affect" presents an initial challenge, as it appears distinct from Act 250 Criterion 8's "unduly adverse" standard, discussed above in our review of the explanation provided by our Supreme Court in Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8, 183 Vt. 336. An initial analysis could lead a reviewer to believe that a municipal standard that merely prohibits an "adverse impact" sets a more difficult standard for a project proponent to overcome than the Act 250 standard of "unduly adverse." But our Supreme Court has "held that the adverse effect test must be applied reasonably to prohibit only substantial and material adverse effects." In re Miller, 170 Vt. 64, 69 (1999)(emphasis added). We therefore apply this "substantially" and "materially" adverse standard in our review of the subsections of Bylaws § 341(2).

1. Bylaw § 341(2)(a):

No evidence was presented at trial that the Lathrop project will compromise the ability of existing or planned community facilities. There may be some similarity between the legal question posed here and our analysis of Act 250 Criterion 9(K), concerning the proposed project's impact upon public investments in town highways. But we understand the question here to be broader, including whether a proposed project could overwhelm or otherwise exceed the capacity of existing community facilities such as schools, fire and police departments, and other such community facilities.

While this project is significant, the only evidence presented causes us to conclude that its impacts upon all community facilities will be minor and fully within the capacities of those community facilities. The project as proposed will only add four employees, so we cannot imagine that an area school does not have the capacity to accommodate any student that may be added as a result of these new employees. Lathrop also has a substantial history of safe operation and courtesy for other users of South Street and Hewitt Road. Because no contrary

evidence was presented at trial, we also conclude that the project's operation will not extend the local or regional police and fire departments beyond their capacities.

In light of this evidence, and because of the lack of contradictory evidence, we conclude that the project as proposed and conditioned conforms to Bylaws § 341(2)(a).

2. Bylaw § 341(2)(b):

This Bylaw provision provides that a proposed project "shall not adversely affect . . . [t]he character of the area affected." Id. We have previously concluded that the project will not create an adverse effect upon the aesthetic, scenic, and natural beauty of this area. In this case we have considered the extensive mitigation and remediation efforts proposed by Lathrop in finding that there will be no material and substantial adverse impact on traffic, noise, aesthetics, or the character of the area. After careful consideration, we also find that the cumulative effect of any impacts on Neighbors will not be materially or substantially adverse to the character of the area. See In re John A. Russell Corp., 2003 VT 93, ¶ 33, 176 Vt. 520 (noting that in considering the effect of a commercial use on nearby residential neighborhoods we must carefully consider the cumulative impacts).

The project will certainly result in some new noises and traffic and will impact views of the area. But given the existing characteristics of the area, the project impacts will not be substantially or materially adverse. We therefore conclude that the project conforms to Bylaws § 341(2)(b).

3. Bylaw § 341(2)(c):

Bylaws § 341(2)(c) prohibits any project that will have an adverse effect upon road and highway traffic. We have previously addressed this project's traffic and highway impacts in our analysis of Act 250 Criteria 5 and 9(K). Since we concluded under these similar Act 250 criteria that the project as proposed will not adversely impact the area roads and highways, we conclude that the project conforms to Bylaws § 341(2)(c).

4. Bylaw § 341(2)(d):

Bylaws § 341(2)(d) asks whether the proposed project will have an adverse affect upon "Bylaws then in effect." We have reviewed in detail in our analysis above all Bylaw provisions that the Lathrop project calls into question. We were not made aware by the parties of additional Bylaw provisions that the project may impact, adversely or otherwise. We therefore conclude that the project as proposed and conditioned conforms to Bylaws § 341(2)(d).

**B. Specific Standards (Bylaws §§ 341(3)(a) through (i))**

This subsection begins with the provision that the ZBA, and this court on appeal, "may require a performance bond to assure construction and maintenance of the proposed use in conformance with any and all conditions attached to any permit." Id. The subsection then lists what appear to be required project characteristics, but there is no precatory language that provides context for this list. Nonetheless, we review whether the proposed project includes the characteristics listed in Bylaws § 341(3), aided by the requirements found in the statutory provision that enables any municipality to include specific standards in its conditional use provisions, 24 V.S.A. § 4414(3)(B).[34] That provision authorizes municipalities to establish specific standards that may "includ[e] requirements with respect to" certain enumerated provisions in the statute. The specific standards enumerated in Bylaws § 341(3) appear to be within the context of the provisions authorized by the enabling statute. We therefore review the proposed project for conformance with the specific standards enumerated in Bylaws §§ 341(3)(a) through (i).

1. Bylaw § 341(3)(a)—"Harmonious" relationship between uses:

The proposed project is of a commercial development nature, as analyzed above in our discussion of conformance to the Town Plan and Act 250 Criterion 10. Other commercial developments already exist in the immediate area, including the Lathrop Forest Products operation across South Street and the other commercial developments at the end of Hewitt Road. This general area has hosted commercial developments for some seventy years, beginning with the Bristol Manufacturing Company. While that commercial activity ceased to operate forty or more years ago, the adjoining property has consistently hosted a large commercial development that included a band mill, timber processing and kiln drying operations, lumber manufacturing, and the largest wholesale manufacturer and supplier of hardwood chips in our State.

The other properties in the surrounding area are principally residential. However, while the proposed sand and gravel extraction operation is considerably different than those

---

[34] This enabling provision was previously codified as 24 V.S.A. § 4407(2), which is cited in the current version of Bylaws § 341. Interestingly, the current enabling law for conditional uses, § 4414(3), requires that if a municipality enacts conditional use review and approval, it "shall require that the proposed conditional use shall not result in an undue adverse effect on" the general and specific standards enacted by the municipality. 24 V.S.A. § 4414(3)(A) (emphasis added).

adjoining uses, the manner in which Lathrop has planned the proposed project avoids conflict with these adjoining residential uses. The project will be screened by pre-existing earthen berms approximately 100 feet high; those berms will remain wooded, therefore providing significant screening from the project for area homes. No adjacent home will view the project as it progresses. The earthen berms, trees, and ground cover will also dampen the noises from the project that can be heard at adjoining residences. Those project noises will be sometimes heard by area residences, but the sound pressure level of those project noises will be similar in level to the other noises that already exist in the neighborhood.

Based upon these project characteristics, we conclude that the project as proposed and conditioned conforms to the specific standard of Bylaws § 341(3)(a).

2. Bylaw § 341(3)(b) — Vehicular circulation safety:

We have previously analyzed the truck traffic and its circulation, both within the project site and on area roads. Based upon our previous determinations, we conclude that the project as proposed and conditioned will provide for "[m]aximum safety of vehicular circulation between the site and the road network." Id. We therefore conclude that the project conforms to this specific conditional use standard as well.

3. Bylaw § 341(3)(c) — Circulation, parking, and loading facilities:

The project does not propose or require parking and loading facilities. As just noted, the project provides for maximum vehicular circulation and safety. The project therefore conforms to Bylaws § 341(3)(c).

4. Bylaw § 341(3)(d) — Landscaping, screening, and setbacks:

Lathrop has pledged to install additional berms and plantings to provide additional screening of views and sounds from the project, for adjacent property owners and others who may be able to view the project site, including from the Ledges above the Village area. Lathrop also pledged to maintain a wooded buffer between the extraction sites and areas to the north for the project's first fifteen years and to allow the wooded hillside that surrounds the project site to remain undisturbed. Lathrop has also pledged to conduct all remediation work on an on-going "progressive" basis, thereby assuring that the project site will return to its natural condition.

We therefore conclude that Lathrop's plans for landscaping, screening, and setbacks are adequate and will achieve a maximum compatibility and protection for adjacent properties.

Because of this, we conclude that the project, as proposed and conditioned, will conform to Bylaws § 341(3)(d).

5. Bylaw § 341(3)(e) — Flooding and ponding:

The project does not propose to allow for or cause any flooding or ponding. The project conforms to Bylaws § 341(3)(e).

6. Bylaw § 341(3)(f) — Energy:

The project will essentially be self-sufficient. The earth resources needed on site will come from the property. No electricity is proposed to be used on site, other than that electricity supplied by any on-site generators. The project will not impact the energy needs of the community. Therefore, it will conform to Bylaws § 341(3)(f).

7. Bylaw § 341(3)(g) — Sewage:

The project will not cause sewage or other effluent to be disposed of on site; no hazard will therefore result. The project conforms to Bylaws § 341(3)(g).

8. Bylaw § 341(3)(h) — Water supply:

The project will not need a water supply system; there is therefore no need to assess the adequacy of its water supply. The project conforms to Bylaws § 341(3)(h).

9. Bylaw § 341(3)(i) — Raw materials storage:

Extracted sand and gravel, as well as top soil stockpiled on site, will all be stored only within the excavated area below the earthen berms surrounding the project. No evidence was received that the adjacent residents will be able to view the project site or its stored materials. There also was no evidence that these stored materials will be viewed from adjacent highways. The only possible views of the stored materials may occur after the first fifteen years of operation, once the excavation and extraction moves into the meadows section of the project site. These views will be from areas and highways that are a thousand or more feet away; some vantage points may be more than a mile away. All views from off-site will be partially or completely screened.

Bylaws § 341(3)(i) provides that the ZBA (or this Court, if an appeal is taken) "may require that the outdoor storage of raw materials or inventory be screened or hidden from public highway view or the view of persons in residential areas." Given the screening that Lathrop has already incorporated into its project plans, we conclude that no further screening or

74

"hiding" is necessary.  We therefore conclude that the project conforms to this final specific conditional use standard.

Given our above determinations, we conclude that the Lathrop project as proposed and conditioned conforms to the general and specific standards of Bylaws § 341.  We therefore respond to Lathrop's second Question in the affirmative: the project conforms to Bylaws § 341.

3.  Does the proposed project comply with Bylaws § 810?

Bylaws § 810 establishes a noise standard for all land development and uses in Bristol by directing that "[n]o noise which is excessive at the property line and represents a significant increase in noise levels in the vicinity of the development so as to be incompatible with the reasonable use of the surrounding area shall be permitted."  We have already conducted a similar analysis, at least as to the project's operational noises, in our review above of the project's conformance to Act 250 Criterion 8.  Although we were aided in that review by the specific noise standards established by the former Environmental Board, and this zoning provision provides a more subjective analysis, we reach a similar conclusion here.  The project as proposed and conditioned will not cause excessive noises or a significant increase in the noise levels heard at adjacent properties.  It will also not cause noises that are incompatible with the reasonable use of surrounding area properties.  To avoid repetition, we choose not to detail the foundation for our conclusions here and instead refer to our analysis under Act 250 Criterion 8 at pages 51–56, above.  For those same reasons, we conclude that the project as proposed and conditioned conforms to Bylaws § 810.

4.  Remaining Lathrop Questions

We have chosen to combine our analysis of Lathrop's remaining Questions because they have several similar themes.  First, we note that Lathrop's Questions 4, 7, and 8 all ask the common question of whether one or more of the Bylaw provisions that we have already addressed above are enforceable or provide the necessary specificity to be enforceable.  In a sense, we have already answered each of these Questions through our analysis of those Bylaws.  We conclude that Bylaws §§ 341, 526, and 810 are enforceable and provide the needed specificity to be enforceable.  We therefore answer each of Lathrop's Questions 4, 7, and 8 in the affirmative: these bylaws provisions are enforceable and provide the necessary specificity to be applied to the Lathrop project.

75

Lathrop's Question 5 repeats the Question posed by the Neighbors of whether the project will result in a pit or steep slopes. We addressed Neighbors' same Question in our analysis above at pages 64–65. For those same reasons, we answer Lathrop's Question 5 in the negative: the project as proposed and conditioned does not result in the pit or steep slopes that are conditionally prohibited by Bylaws § 526(2).

Lathrop's Question 6 asks whether the ZBA "erred" by not concluding that Lathrop could comply with Bylaws § 526(2) through a permit condition. Our conclusion here makes such a Question moot. More importantly, however, this is a de novo appeal in which "the case is heard as though no action whatever had been held prior thereto." Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 11 (1989). Thus, whether the ZBA "erred" in its earlier decision is beyond our scope of review. We therefore decline to answer Lathrop's Question 6 and dismiss it.

Lastly, we address Lathrop's Question 9, which asks whether the proposed project "meets all applicable Ordinance provisions." We have perhaps been guilty of speaking at great lengths in this Decision, which has resulted in our delay of rendering a final determination. However, following this lengthy review we are as certain as we can be that we have addressed all Bylaw provisions that may control this project. We therefore answer Lathrop's final Question in the affirmative, based upon the analysis already conducted: we conclude that the Lathrop project, as now proposed and conditioned, conforms to all applicable ordinance provisions.

For all these reasons, we conclude that the Lathrop sand and gravel extraction project, as proposed at trial and conditioned in this Decision, conforms to all applicable ordinance provisions and is hereby **APPROVED**. For clarity purposes, the conditions determined in the body of this Decision are recited below.

### Conclusion

For all of the reasons discussed above, we conclude that Lathrop's application for an Act 250 permit (Application #9A0315-2) is hereby **APPROVED** and its application for a municipal conditional use approval and a zoning permit is hereby **APPROVED**, subject to the following conditions:

1. Lathrop shall submit final revised plans to both the District #9 Commission Coordinator and the Town of Bristol Zoning Administrator, incorporating all changes presented at trial and including the removal of a portion of the berm that will remain along the northern portion of the project, adjacent to and including the access road.

2. Lathrop shall also submit plans detailing its access road construction, South Street improvements, and remaining remediation work contemplated in its Phase 6 work in the meadows section, and shall provide cost estimates for such work, so that such cost estimates and plans may be used to establish the performance bond that Lathrop is to secure for the benefit of the Town.

3. The performance bond that Lathrop supplies to the Town shall be in an amount necessary to secure the performance of the work and improvements described in the plans Lathrop submits in accordance with the above paragraph 2. Lathrop shall provide the Town with a written certification that the bond is then currently in place and available for call by the Town in the event of Lathrop's substantial non-performance and abandonment of the project. Lathrop shall provide this written certification before commencing work at the project site at the beginning of each operational season. The amount of the bond may be reduced as work is completed, in accordance with the previously estimated cost of such work. For any material changes not anticipated in such work plans, Lathrop must submit revised plans and cost estimates to the Town with its annual certification.

4. The project shall be constructed, operated, remediated, and completed in accordance will all plans admitted as exhibits in these consolidated appeal proceedings, all conditions imposed by this Decision, and all terms and conditions of approval by the District Commission and the Town of Bristol Zoning Board of Adjustment that were not superseded by this Decision.

5. Lathrop shall provide the District Commission Coordinator and the Zoning Administrator with complete copies of all exhibits admitted in these consolidated appeal proceedings, and shall retain a full copy of all such admitted exhibits and make them available for review on reasonable terms during normal business hours.

6. Lathrop shall restrict the annual yield of sand and gravel to **60,000 cubic yards** and the maximum **one way truck trips to no more than 100 per day** unless and until authorized by both the District Commission and the ZBA to increase such limits.

7. Lathrop shall also only operate the project in accordance with the terms and conditions of its proposed Operational Parameters (Exhibit 10), subject to the following revisions:

   a. The Extraction and Trucking Limits, specified on page 2, are hereby revised to conform to the extraction and trucking limits specified above at paragraph 6.

   b. The Recommended Conditions of Approval section on page 3 shall be revised to reference a maximum daily loaded truck limit to 50 trips (100 trip ends).

   c. The Access Road Construction section on page 4 shall be revised to state that the road shall be paved for the first 7_50_ feet, to conform to Mr. Matosky's trial testimony.

   d. The Noise mitigation section on pages 4–5 shall be revised to include the references to using European-style mufflers, where available, and the prohibition against use of engine compression or "jake" brakes as specified herein in Finding 152 on pages 41–42.

   e. The Reclamation section on page 5 shall be revised to incorporate and reference Lathrop's revised plans to remove a portion on the earthen berm that remains on the northern border of the project site, once all extraction work is complete.

8. Lathrop shall operate the permitted project only in accordance with the revised plans and conditions referenced in this Decision, the Act 250 permit to be issued by the District Commission, and the zoning permit to be issued by the Zoning Administrator.

9. All terms and conditions announced or referenced herein shall run with the land and shall be binding upon Lathrop, its successors, and assigns.

Lathrop's Act 250 permit application is hereby remanded to the District Commission and its revised zoning permit application is hereby remanded to the Bristol Zoning Administrator so as to complete the ministerial acts of issuing the respective state land use ("Act 250") and municipal zoning permits to Lathrop in accordance with this Merits Decision and the unappealed determinations from the respective Commission and ZBA. The respective permits should, however, exclude the terms and conditions from the respective Commission and ZBA decisions that are superseded by the determinations the Court announces in this Decision.

A Judgment Order accompanies this Merits Decision. This completes the current proceedings before this Court in these consolidated appeals.

Done at Berlin, Vermont, this 18th day of October 2013.


_____
Thomas S. Durkin, Judge